IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MONTRAY QUINTIN PATTON,<br><br>Defendant. | 4:21CR3084<br><br>**FINDINGS, RECOMMENDATION AND ORDER** |

This matter is before the court on Defendant Montray Q. Patton's motion to dismiss. (Filing No. 58). For the reasons explained below, the motion should be denied.

## BACKGROUND

The facts of this case are outlined in the court's prior order on Defendant's motion to suppress (Filing Nos. 35 and 37) and are not meaningfully disputed here. The court summarizes them as follows:

Defendant was a passenger in a rental vehicle traveling in Seward County, Nebraska, when law enforcement stopped the vehicle for a traffic violation. After various interactions between law enforcement and the occupants of the vehicle, a canine was deployed to walk around the exterior of the vehicle. The canine alerted and indicated to the odor of narcotics. Officers then searched the vehicle and found, among other things, six disassembled AR-15 style rifles with their serial numbers removed. According to Patton, when questioned about the rifles, he stated he had purchased them from a man in Kentucky, and he had not noticed that the serial numbers had been removed.

On July 22, 2021, Patton was indicted on one count of knowingly possessing firearms that had been shipped and transported in interstate commerce from which the manufacturer's serial numbers had been removed or obliterated, in violation of Title 18, U.S.C. § 922(k). (Filing No. 1).

ANALYSIS

Patton moves to dismiss the indictment, arguing that 18 U.S.C. § 922(k) is unconstitutional under the Supreme Court's ruling in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S.Ct. 2111 (2022). (Filing No. 58). Citing Bruen, Patton argues that § 922(k) violates the Second Amendment because prohibiting possession of firearms with removed serial numbers is inconsistent with the nation's historical tradition of firearm regulation.

No federal court of appeals has yet addressed the constitutionality of § 922(k) in light of Bruen. Of the six district courts that have addressed the issue, five have held that § 922(k) is constitutional, and one has held that it is unconstitutional. United States v. Bradley, No. 2:22CR98, 2023 WL 2621352, (S.D W. Va. Mar. 23, 2023) (constitutional); United States v. Serrano, No. 3:21CR1590, 2023 WL 2297447 (S.D. Cal. Jan. 17, 2023) (constitutional); United States v. Tita, No. 1:21CR334, 2022 WL 17850250 (D. Md. Dec. 22, 2022) (constitutional); United States v. Reyna, No. 3:21CR41, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) (constitutional); United States v. Holton, No. 3:21CR482, 2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) (constitutional); and United States v. Price, No. 2:22CR97, 2022 WL 6968457 (S.D. W. Va. October 12, 2022) (unconstitutional). For the reasons stated below, the court agrees with the majority of district courts considering the question and finds that § 922(k) is constitutional. As such, Patton's motion should be denied.

Until recently, federal courts analyzing Second Amendment challenges applied a two-step approach that "combine[d] history with means-end scrutiny." Bruen, 142 S.Ct. at 2125. Courts asked "if the restricted activity [was] protected by the Second Amendment in the first place; and then, if necessary, [would] ... apply the appropriate level of scrutiny." United States v. Focia, 869 F.3d 1269, 1285 (11th Cir. 2017). This approach was developed following the Supreme Court's rulings in District of Columbia v. Heller, 554 U.S. 570 (2008), and McDonald v. Chicago, 561 U.S. 742 (2010), where the Court held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense.

However, rather than adopting the two-part test developed by the lower courts post-Heller, Bruen introduced a different two-part test. Under Bruen, "[w]hen the Second Amendment's plain text covers an individual's conduct, the constitution presumptively protects that conduct." Bruen, 142 S.Ct. at 2126. To justify a regulation of such conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. The test requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." Id. at 2131. As in Heller and McDonald, the Bruen Court determined at least two metrics will guide the inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132-33.

Defendant argues § 922(k) is unconstitutional under the Bruen two-part test. Citing the Price decision entered by the District Court for the Southern District of West Virginia, Defendant argues § 922(k) is not a "mere commercial regulation" but instead "infringe[s] on one's right to possess a firearm" in a manner inconsistent with "the historical tradition that delimits the outer bounds of the right to keep and

3

bear arms." Price, 2022 WL 6968457, at *3-6. The Government responds that the conduct prohibited by § 922(k) is not protected by the Second Amendment's plain text, and even if it was, § 922(k) is consistent with the historical tradition of firearms regulation.

1. Second Amendment's plain text

Under the Bruen framework, the Court must first determine whether § 922(k) regulates conduct protected by the Second Amendment. Bruen, 142 S.Ct. at 2126; 2134-35. That is, does the plain text of the Second Amendment protect Patton's conduct—possessing firearms with removed or obliterated serial numbers?

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. When analyzing the plain text of the Second amendment, the Supreme Court in Bruen relied on its Heller analysis. See Bruen, 142 S.Ct. at 2134-35. As explained in Heller, the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." Bruen, 142 S.Ct. at 2134 (citing Heller, 554 U.S. at 592). Moreover, it protects the right of ordinary, law-abiding citizens to possess firearms for self-defense. Bruen, 142 S.Ct. at 2133.

As the majority of district courts have held, while § 922(k) prohibits transporting, shipping, receiving, and possessing firearms with altered or removed serial numbers, it does not infringe on an individual's right to possess and carry a weapon for self-defense—the "central component" protected by the Second Amendment. Bruen, 142 S. Ct. at 2134. See also Holton, 2022 WL 16701935 at *4. "The presence of a serial number does not impair the use or functioning of a weapon in any way[.] … [A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm." Id. (citing U.S. v. Marzzarella, 614

4

F.3d 85, 94 (3d Cir. 2010). A serial number is a "nonfunctional characteristic" of a gun—"keeping a serial number doesn't reduce a gun's usefulness for self-defense, and obliterating a serial number doesn't make a gun more useful for self-defense.:" Reyna, 2022 WL 17714376, at *4-5.

The court in Price broadly reasoned that § 922(k) regulates "mere possession" of a firearm because a person can lawfully purchase or transfer a firearm, but that person is in violation of § 922(k) the moment the serial number is destroyed. Price, 2022 WL 6968457, at *3. As regulating possession, the Price court found § 922(k) "squarely within the Second Amendment's plain text."

This approach is too broad. The Supreme Court has consistently evaluated Second Amendment regulations with specificity. In Heller, the challenged regulation prohibited handgun regulation in the home, so the court evaluated the regulated conduct as possession *in the home*. See Heller, 554 U.S. at 628. Likewise, in Bruen, where the challenged regulation prohibited carrying a handgun in public without first proving "proper cause" for doing so, the Court evaluated whether the regulation unlawfully restricted the right to *publicly* carrying a handgun. See Bruen, 142 S.Ct. at 2134. Neither case broadly categorized the protected conduct as mere possession. "The regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text— a plain text that is more complex than mere possession." Reyna, 2022 WL 17714376, at * 4.

Importantly, the Second Amendment "is not a right to keep and carry any weapon whatsoever in any manner whatsoever." Heller, 554 U.S. at 626. And § 922(k) does not infringe on an individual's right to carry a weapon for self-defense. Simply put, the plain text of the Second Amendment does not encompass the conduct prohibited by § 922(k).

5

2. Historical tradition of firearm regulation

Alternatively, even if the Second Amendment does protect the conduct regulated by § 922(k), the statute is nonetheless "consistent with this Nation's history of firearm regulation," and is constitutional. See Bruen, 142 S. Ct. at 2130.

When examining present-day firearm regulations, the "historical inquiry that courts must conduct will often involve reasoning by analogy." Bruen, 142 S.Ct. at 2132. The court must determine if a historical regulation and modern regulation are "relevantly similar" by considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." Id. at 2133 (citing McDonald, 561 U.S. at 767 (quoting Heller, 554 U.S. at 599))). When considering whether a regulation withstands constitutional muster, the government need only identify a "historical analogue, not a historical twin." Id. at 2133.

The modern regulation, the Gun Control Act of 1968 from which § 922(k) originates, is intended "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." Serrano, 2023 WL 2297447, at *13 (citing Barrett v. United States, 423 U.S. 212, 218 (1976)). "The goal of § 922(k), in particular, is to assist law enforcement by making it possible to use the serial number of a firearm recovered in a crime to trace and identify its owner and source." Marzzarella, 614 F.3d at 98.

In colonial times, when manufacturer-stamped serial numbers did not exist, various colony or state regulations provided varying means of tracing the transfer of guns and the identity of a gun's owner. Colonial governments "substantially

6

controlled the firearms trade." Teixeira v. Cnty. Of Alameda, 873 F.3d 670, 685 (9th Cir. 2017).  "The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers." Id. Colonial governments enacted criminal laws restricting the sale of firearms or ammunitions to individuals they considered dangerous. Id. at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland and Virginia restricting sales to Native Americans). New York law restricted the trading of guns, gun powder, and lead by private individuals; Virginia law required the recording of all "arms and munitions" arriving in the colony; and Connecticut prohibited selling firearms outside the colony. Id. (citing Robert Spitzer, Gun Law History in the United States and the Second Amendment Rights, 80 L. & Contemp. Probs. 557 (2017)).

To assist in assuring the gun regulations and laws were being followed, the Founders implemented "mandatory musters" which required individuals with a gun to "show up and register their firearm." Holton, 2022 WL 16701935, at * 5 (citing Meg Penrose, A Return to the States' Rights Model: Amending the Constitution's Most controversial and Misunderstood Provision, 46 Conn.L.Rev. 1463, 1483 (2014)). And in some states, including New Hampshire and Rhode Island, government officials conducted door-to-door surveys of gun ownership, sometimes temporarily seizing the gun from its owner. See Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in America, 113 (W.W. Norton & Co. 2011). Shortly after the Second Amendment's ratification, Massachusetts and Maine required gun barrels to be marked in a permanent manner and imposed fines for failing to do so. (Filing No. 63 at CM/ECF pp. 11-12); see also Massachusetts-Perpetual Laws of the Commonwealth, at 259-61 (1801-1807); Laws of the State of Maine, at 546 (1830).[1]

---

[1] The court takes judicial notice of the two laws referenced by the government, attached hereto for the convenience of the District Judge as Attachments 1 and 2. See McIndoo v. Burnett, 494 F.2d 1311, 1313 (8th Cir. 1974) ("[T]he law of any state of the Union, whether depending upon statutes or upon judicial

7

The founding fathers enacted gun control laws to confirm who owned guns, to monitor the transfer of gun ownership, and to regulate who could legally own guns, with penalties assessed for unlawful gun sales. These goals, historically accomplished by, for example, door-to-door inspections or reporting for muster, are now accomplished by registering and tracing serial numbers affixed to the weapon itself. See Marzzarella, 614 F.3d at 98 (discussing the purposes of the Gun Control Act of 1968 to include keeping firearms away from dangerous persons and assisting law enforcement in tracing and identifying the source and owner of firearms used in crimes). Compared to the personal inspections performed during colonial times, requiring serial numbers on guns is far <u>less</u> burdensome on a law-abiding person's ability to possess a gun for self-defense. Bruen, 142 S. Ct. at 2133 (requiring modern and historical regulations to impose only a "comparable burden" on the right of armed self-defense); <u>see also</u> Holton, 2022 WL 16701935, at *5 (noting "requiring individuals to purchase firearms with serial numbers imposes little to no burden on an individuals' right to bear arms.").

18 U.S.C. § 922(k) is "consistent with the Second Amendment's text" and with "historical understanding." Bruen, 142 S.Ct. at 2131. The statute is constitutional. Defendant's motion to dismiss should be denied.

Accordingly,

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to dismiss (Filing No. 58) be denied.

---

opinions is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.").

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS FURTHER ORDERED:

1) A telephonic conference with counsel will be held before the undersigned magistrate judge at 11:30 a.m. on April 18, 2023 to discuss setting any change of plea hearing, or the date of the jury trial and deadlines for disclosing experts as required under Rule 16. Counsel for all parties shall use the conferencing instructions provided by the court to participate in the call.

2) The time between today's date and April 18, 2023 shall be deemed excludable time in any computation of time under the requirements of the Speedy Trial Act, because although counsel have been duly diligent, additional time is needed to adequately prepare this case for trial and failing to grant additional time might result in a miscarriage of justice. 18 U.S.C. § 3161(h)(1) & (h)(7). Failing to timely object to this order as provided under this court's local rules will be deemed a waiver of any right to later claim the time should not have been excluded under the Speedy Trial Act.

Dated this 30th day of March, 2023.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

# LAWS

OF THE

# STATE OF MAINE;

TO WHICH ARE PREFIXED

THE

## CONSTITUTION OF THE UNITED STATES

AND OF SAID STATE,

## WITH AN APPENDIX.

———◆◆◆———

*HALLOWELL:*
PRINTED AND PUBLISHED BY GLAZIER, MASTERS & CO.
No. 1, Kennebec-Row.
::::::::::
1830.

**Attachment 2**

546   FIREARMS.—PAPER.

## CHAPTER CLXII.

An Act to provide for the proof of Firearms.

*Governor to appoint provers of gun barrels.*

SEC. 1. BE *it enacted by the Senate and House of Representatives, in Legislature assembled,* That the Governor, by and with the consent of the Council, be and he hereby is empowered to appoint suitable persons, to be provers of the barrels of all new, or unused firearms; and it shall be the duty of each person so appointed, to prove and try the strength of the barrels of all firearms which shall be offered him for that purpose, in such manner as to satisfy himself of the strength of the same; and shall in a permanent manner, mark and number every barrel by him so proved, and make, and deliver to the person applying to have the same proved, a certificate for each barrel proved, and found good in the form following :

*Barrels to be marked and certificate given.*

I certify that on this    day of    A. D. 18    I proved for   , a musket, pistol, or rifle barrel, (as the case may be,) and which is numbered and marked as in the margin, and that the same is good and strong.

A. B. Prover of firearms.

*Prover's fees.*

SEC. 2. *Be it further enacted,* That each prover shall be entitled to receive from the person applying to have such barrel proved, twenty-five cents, in addition to the expense of the powder necessary for that purpose for each barrel so proved; whether the same shall stand the proof and be marked or not.

*Penalty for selling guns or pistols, not proved and marked.*

SEC. 3. *Be it further enacted,* That if any person shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified according to the provisions of this Act, he shall forfeit for each barrel so sold, the sum of ten dollars, to be recovered by an action of debt before any Court proper to try the same; to the use of any person who shall sue for and recover the same, or by indictment to the use of the State.

*How recovered.*

*Penalty for altering marks or certificates.*

SEC. 4. *Be it further enacted,* That if any person shall falsely alter the stamp or mark or the certificate of any prover of firearms, appointed as aforesaid, and be convicted thereof before any Court proper to try the same, he shall forfeit and pay a fine of not more than one hundred dollars, nor less than twenty dollars, according to the nature and aggravation of the offence, for the use of the State.

[*Approved March* 10, 1821.]

# THE
# Perpetual Laws

## OF THE
## Commonwealth of Massachusetts,

FROM

THE ESTABLISHMENT OF ITS CONSTITUTION IN
THE YEAR 1780, TO FEBRUARY, 1807.

WITH THE

*CONSTITUTIONS OF THE UNITED STATES OF AMERICA,
AND OF THE COMMONWEALTH, PREFIXED.*

IN FOUR VOLUMES.

TO WHICH IS ADDED, IN THE THIRD VOLUME,

## AN APPENDIX,

CONTAINING ACTS AND CLAUSES OF ACTS, FROM THE LAWS
OF THE LATE COLONY, PROVINCE AND STATE OF
MASSACHUSETTS, WHICH EITHER ARE UNREVISED
OR RESPECT THE TITLE OF REAL ESTATE.

## VOLUME IV.

Containing the Laws from January, 1801, to February, 1807, inclusive.

*Ignorantia legis neminem excusat.*
The Ignorance of Law is an Excuse for no One.

The Law is the Subject's best Birthright.

---

### Boston.

PUBLISHED BY *THOMAS & ANDREWS*, AND SOLD AT THEIR
BOOKSTORE, NO. 45, NEWBURY-STREET...JUNE, 1807.

J. T. BUCKINGHAM, PRINTER.

**Attachment 1**

than twice the amount of gold and silver actually in their vaults," be, and the same is hereby repealed; and hereafter the said Corporation shall not issue and have in circulation, at any one time, bills, notes, or obligations, to a greater amount than twice the capital stock actually paid in.

SECT. 2. *And be it further enacted*, That instead of six, not less than five Directors of the aforesaid Corporation shall constitute a board for the transaction of business, of whom the President shall always be one, except in case of sickness or necessary absence, in which case the Directors present may choose a Chairman in his stead.

[This Act passed *March* 8, 1805.]

*Not to issue bills for more than twice the capital.*

*Directors.*

---

An Act making a temporary Alteration in the Toll to be received by *The Proprietors of the Locks and Canals on Connecticut River.*

[This Act passed *March* 8, 1805.]

---

An Act to incorporate the north-westerly Part of the Town of *Otisfield*, and the easterly Part of the Town of *Bridgeton*, in the County of *Cumberland*, into a separate Town by the Name of *Harrison*.

[This Act passed *March* 8, 1805.]

---

An Act to provide for the Proof of Fire Arms manufactured within this Commonwealth.

WHEREAS no provision hath been made by law for the proof of fire arms manufactured in this Commonwealth, by which it is apprehended that many may be introduced into use which are unsafe, and thereby the lives of the citizens be exposed: To prevent which,

SECT. 1. *Be it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That the Governor, by and with the advice and consent of the Council, be, and he hereby is empowered to appoint, in any part of this Commonwealth where the manufacture of fire arms is carried on, suitable persons to be provers of fire arms, not exceeding two in any county, who shall be sworn to the faithful discharge of their trust, whose duty it shall be to prove all musket barrels and pistol barrels, which being sufficiently ground, bored and breeched, shall be offered to him to be proved; who shall prove the musket barrels twice in manner following, viz. first with a charge consisting of one eighteenth part of a pound of powder, one ounce of which, in a five and

*Preamble.*

*Provers of fire arms to be appointed.*

*How arms are to be proved.*

an

260         PROOF OF FIRE ARMS.         *March* 8, An. 1805.

an half inch howitz, at an elevation of forty five degrees, will carry a twenty-four pound shot eighty yards, with a ball suited to the bore of the barrel ; the second proof to be with a charge consisting of one twenty-second part of the same powder, with a ball suited to the bore of the barrel ; and shall prove the pistol barrels once with a charge consisting of one twenty-second part of a pound of powder, one ounce of which, in a five and half inch howitz at an elevation of forty-five degrees, will carry a twenty-four pound shot seventy yards, with a ball suited to the bore of the barrel ; which said powder and ball it shall be the duty of the prover to provide ; and if the said musket and pistol barrels shall stand the proof aforesaid, and shall in no respect fail, then it shall be the duty of the said prover to stamp the same on the upper side, and within one and an half inches of the breech of said barrels, with a stamp consisting of the initial letters of the prover's name, and over those letters the letter P. also, in the line of the said initial letters, and further up said barrel the figures designating the year of our Lord in which the proof is made, and over the said figures the letter M. which said letters and figures shall be so deeply impressed on said barrel, as that the same cannot be erased or disfigured, and shall be in the form following                P        M

ing AB 1805. And when any barrels shall burst or shall in any manner fail in the proving as aforesaid, so that in the opinion of the prover they are unfit for use, they shall not be stamped, but the said prover shall suffer the owner to take them away; and any prover so proving musket or pistol barrels as aforesaid, shall be entitled to receive from the owner, for each musket barrel *thirty three cents*, and for each pistol barrel *twenty five cents*, whether the same stand proof and are stamped or not.

SECT. 2. *And be it further enacted*, That if any person, after the first day of *June* next, shall manufacture within this Commonwealth, any musket or pistol, without having the barrels proved and stamped as aforesaid, except such as are or may be manufactured in the armory of the *United States*, or in fulfilment of some contract made and entered into, or that may hereafter be made and entered into, for the manufacturing of fire-arms for the *United States*, shall forfeit and pay for every such musket or pistol the sum of *ten dollars*, to be recovered in an action of debt, before any Court proper to try the same, by any person who shall sue for and recover the same, to his own use.

SECT. 3. *And be it further enacted*, That if any person, after the said first day of *June* next, shall sell and deliver, or shall knowingly purchase, any musket or pistol, which shall have been manufactured within this Commonwealth after the

said

*Marginal notes:*
How approved arms are to be marked.
Fees.
Penalty for not having arms proved.

said first day of *June* next, which shall not have the marks of proof above required, the person so selling and the person so purchasing shall each forfeit the sum of *ten dollars*, to be recovered by action of debt, before any Court proper to try the same, to the use of any person who shall sue for and recover the same.

*Penalty for selling or buying arms not proved.*

SECT. 4. *And be it further enacted*, That if any person shall falsely forge or alter the stamp of any prover of fire-arms, so appointed as aforesaid, impressed on any musket or pistol barrel, pursuant to this Act, and be convicted thereof before the Supreme Judicial Court, he shall be punished by fine not exceeding *fifty dollars*, nor less than *twenty dollars*, according to the nature and aggravation of the offence.

*Penalty for forging stamp.*

[This Act passed *March 8*, 1805.]

---

An Act to incorporate a Number of the Inhabitants in the Town of *Limington*, in the County of *York*, into a separate Religious Society by the Name of *The First Baptist Society in Limington*.
    [This Act passed *March 8*, 1805.]

---

An Act directing the Mode of attaching on Mesne Process, and selling by Execution Shares of Debtors in incorporated Companies.

SECT. 1. *B*E it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, That the share or shares or interest of any person, in any turnpike, bridge, canal or other company, which heretofore has been or hereafter may be incorporated by the Legislature of this Commonwealth, with all the rights and privileges appertaining to such shares, may be attached on mesne process and taken on execution; and when any such shares or interest shall be attached on mesne process, or taken on execution without such previous attachment, an attested copy or copies of such writ of attachment or execution, shall, by the officer holding the same, be left with the Clerk and Treasurer or Cashier of such company; and so many of said shares or so much of said interest may be sold on said execution at public vendue, to the highest bidder, as shall be sufficient to satisfy the same, and the charges of the sale, after notice shall have been given of the time and place of sale in manner as hereinafter provided; and in case the officer making the sale, or the purchaser or purchasers of any such shares or interest, do cause an attested copy or copies of such execution, and the officer's return thereon, to be left with such Clerk and Treasurer or Cashier, within fourteen days after the sale is completed, and

*Shares may be attached on mesne process, taken in execution, and sold.*

pay