

_____

No. 3:18-CR-165-CWR-FKB

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

JESSIE BULLOCK,

*Defendant.*

_____

ORDER DISMISSING CASE

_____

Before CARLTON W. REEVES, *District Judge.*

Gun-rights advocates used to say that the Second Amendment was treated as a "second-class" right. Robert J. Cottrol, *Structure, Participation, Citizenship, and Right: Lessons from Akhil Amar's Second and Fourteenth Amendments*, 87 Geo. L.J. 2307, 2324 (1999). That all changed in 2008. That year, the Supreme Court decided that the Second Amendment guarantees individuals the right to keep and bear arms in their home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

In so doing, the Court forged a broad definition of the right to bear arms. And in the years since, the Court has continued to expand that definition. *See McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010). Firearm restrictions are now presumptively unlawful unless the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

In this case, the federal government seeks to imprison Jessie Bullock for possessing a firearm as a convicted felon. *See* 18 U.S.C. § 922(g)(1). Mr. Bullock claims that this is a violation of his Second Amendment rights. He observes that he finished serving his sentence long ago, and the available evidence indicates that the firearm the government complains of was kept in the sanctity of his home. Yet Section 922(g)(1)'s ban on gun possession is a lifetime one.

The question presented appears simple: has the government demonstrated that, as to Mr. Bullock, the federal felon-in-possession ban is consistent with America's "historical tradition of firearm regulation"?

The government says the answer is also simple: "yes." It points to more than 120 U.S. District Court decisions which recently determined that the government had met its burden—at least in those cases.

This Court is not so sure. The government's citation to the mere volume of cases is not enough. *See Heller*, 554 U.S. at 624 n.24 (rejecting decisions of "hundreds of judges"). There also is doubt about the process those cases used to determine the history of the felon-in-possession ban. In none of those cases did the government submit an expert report from a historian

2

justifying felon disarmament. In none of those cases did the court possess an amicus brief from a historian. And in none of those cases did the court itself appoint an independent expert to help sift through the historical record.

It is unsurprising that the government relies on jurisprudence filled with such methodological flaws. The same errors define the Supreme Court's own Second Amendment jurisprudence.

In *Heller*, Justice Scalia's opinion for the Court conducted a *de novo* review of history using the parties' briefs and amicus briefs from academics. That was surprising in light of Justice Scalia's long-held belief that "[s]ign-on, multiple-professor amicus briefs in a case . . . are . . . a political rather than an academic exercise" motivated by "partisanship" and "hopes for preferment." Memorandum from Associate Justice Antonin Scalia to Associate Justice John Paul Stevens, No. 95-1853, Clinton v. Jones, at 2 (April 4, 1997). It was further surprising given Justice Scalia's disapproval of the Court "picking and choosing those [studies] that support its position" while "never explain[ing] why those particular studies are methodologically sound." *Roper v. Simmons*, 543 U.S. 551, 617 (2005) (Scalia, J., dissenting).

Justice Scalia knew firsthand the risk of cherry-picking briefs to support one's ideological priors. *See id.* Yet it appears that the Court continues to engage in "law office history"—that is, history selected to "fit the needs of people looking for ammunition in their causes"—in Constitutional interpretation. Gordon S. Wood, *The Supreme Court and the Uses of History*, 39 Ohio N.U. L. Rev. 435, 446 (2013).

Nevertheless, the standard announced by the Supreme Court in *Bruen* is the law of the land. It must be enforced. Under that standard, the government has failed to meet its burden.

The federal felon-in-possession ban was enacted in 1938, not 1791 or 1868—the years the Second and Fourteenth Amendments were ratified. The government's brief in this case does not identify a "well-established and representative historical analogue" from either era supporting the categorical disarmament of tens of millions of Americans who seek to keep firearms in their home for self-defense. *Bruen*, 142 S. Ct. at 2132; *see* Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Conviction*, 160 U. Pa. L. Rev. 1789, 1791 (2012) (explaining that "tens of millions" of free-world Americans have criminal records).

American history might support state-level felon disarmament laws; that at least would align with principles of federalism. It might support disarmament of persons adjudicated to be dangerous—as Justice Barrett found when she sat on the Seventh Circuit. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting). And it likely *does* support disarmament of persons convicted of death-eligible offenses. The power to take someone's life necessarily includes the lesser power to disarm them.

The government's arguments for permanently disarming Mr. Bullock, however, rest upon the mirage of dicta, buttressed by a cloud of law review articles that do not support disarming him.[1] In *Bruen*, the State of New York presented 700 years of

---

[1] Chief Justice Roberts views law review articles with a jaundiced eye. They are not "particularly helpful for practitioners and judges," he says. Brent E. Newton, *Law Review Scholarship in the Eyes of the Twenty-First-*

history to try and defend its early 1900s-era gun licensing law. That was not enough. *Bruen* requires no less skepticism here, where the challenged law is even younger.

For the reasons that follow, therefore, Mr. Bullock's motion to dismiss will be granted.

## I. Factual and Procedural History

### A. Mr. Bullock

In 1992, thirty-one year old Jessie Bullock got into a deadly "bar fight" in Jackson, Mississippi. Docket No. 38 at 44 (quoting U.S. Magistrate Judge F. Keith Ball). He was convicted of aggravated assault and manslaughter. Docket No. 20 at 8. As a result of those felonies, Mr. Bullock served "about 15, 16 years" in state prison and lost several civil rights. Docket No. 38 at 33 (quoting Ella Bullock).[2]

Mr. Bullock also permanently lost his right to possess firearms and ammunition. At the time, the Second Amendment provided him no safe harbor, no protection. *See United States v. Darrington*, 351 F.3d 632, 633-34 (5th Cir. 2003). If Mr. Bullock was ever found with firearms or ammunition, he could be charged with a new crime and, if convicted, sent back to prison. *See* 18 U.S.C. § 922(g)(1).

---

*Century Supreme Court Justices: An Empirical Analysis*, 4 Drexel L. Rev. 399, 399 (2012). While this Court does not subscribe to that view, other justices have also been critical of modern law review scholarship. *Id.* at 399 n.1.

[2] In 2015, Mr. Bullock was convicted of fleeing law enforcement and attempted aggravated assault of a law enforcement officer. Docket No. 20 at 4. He was sentenced to five years' incarceration, with all of that time suspended.

That is the case before this Court. The government alleges that Mr. Bullock violated § 922(g)(1) by knowingly possessing a firearm on May 3, 2018, when he was about 57 years old.

The grand jury returned its first indictment in August 2018. It charged Mr. Bullock with knowingly possessing a firearm, demanded forfeiture of his firearms and ammunition, and sought a mandatory minimum of 15 years' incarceration.

The government did not arrest Mr. Bullock at that time. It is not clear that Mr. Bullock even knew about the pending charge. Fourteen months passed with no activity.

In October 2019, the grand jury returned a superseding indictment. This charging document amended the sentencing request to no more than 10 years in federal prison.[3] More time passed.

Mr. Bullock was finally arraigned in March 2020, around the start of the pandemic. The Magistrate Judge held a detention hearing the next month. After listening to the testimony, Judge Ball thought it "downright silly" to claim that Mr. Bullock "poses a danger to his wife, contrary to her own sworn testimony, contrary to the time that he's been out on bond from this very incident, and no one feeling that he poses such a danger that they needed to go pick him up as early as August of 2018 when he was first indicted." Docket No. 38 at 45-46. Judge Ball released Mr. Bullock on an unsecured bond. Mr. Bullock has remained on bond ever since, without incident.

---

[3] Each indictment alleged that Mr. Bullock also goes by "Booman." Testimony at the detention hearing revealed that Booman Bullock is Mr. Bullock's son. Docket No. 38 at 29.

A series of pandemic-related continuances followed. The continuances were unopposed, as the U.S. Attorney's Office and the Federal Public Defender agreed that trials should proceed first for those defendants detained in jail.

With the pandemic receding in 2022, this matter was almost ready to be tried before a jury of Mr. Bullock's peers. In August of that year, however, he filed the present motion to dismiss. The Court turns to that now.

## B. The Present Motion

Mr. Bullock argues that the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen* renders the federal felon-in-possession law unconstitutional as applied to him.

*Bruen* was about the State of New York's handgun rules. While 43 states issued licenses to publicly carry handguns based on "objective criteria," New York and a handful of other states also required citizens to show a "special need" for the handgun. 142 S. Ct. at 2122. When two citizens could not meet that standard, they and a gun-rights organization sued, calling it an unconstitutional infringement of the Second Amendment guarantee.

The U.S. Court of Appeals for the Second Circuit upheld New York's "special need" requirement, finding it "'substantially related to the achievement of an important governmental interest.'" *Id.* at 2125 (citation omitted).

In *Bruen*, however, the Supreme Court rejected that approach. An individual's Second Amendment rights should not be weighed against the government's interests in public safety, it said. The Court instead announced a new standard. It is reproduced here:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (citation omitted). This ruling abrogated Fifth Circuit precedent. *See id.* at 2127 n.4 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194-95 (5th Cir. 2012)).

Pursuant to *Bruen*, Mr. Bullock's motion contends that the statute prohibiting him from ever again possessing firearms or ammunition, § 922(g)(1), is unconstitutional. "The prosecution cannot meet its burden of establishing that Section 922(g)(1), as applied to Mr. Bullock, is 'consistent with the Nation's historical tradition of firearm regulation,'" he argues. Docket No. 61 at 4. "'Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons.'" *Id.* at 5 (quoting *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting)).

The government disagrees. Its three-and-a-half-page brief limits *Bruen* to its facts, arguing that the decision "says nothing about the statute at issue in this case." Docket No. 63 at 3. The government then summarily asserts that § 922(g)(1) "is

8

part of the historical tradition of regulating firearms posses-
sion." *Id.*

### C. Appointing An Expert Historian

After reviewing the briefs and *Bruen*, this Court grew con-
cerned. Judges are not historians. We were not trained as his-
torians. We practiced law, not history. And we do not have
historians on staff. Yet the standard articulated in *Bruen* ex-
pects us "to play historian in the name of constitutional adju-
dication." Docket No. 65 at 3, available at *United States v. Bull-
ock*, No. 3:18-CR-165, 2022 WL 16649175 (S.D. Miss. Oct. 27,
2022).

In this case, no historian has expressed an opinion regarding
the history of felon disarmament. Neither the government nor
Mr. Bullock submitted an expert report on the historical ana-
logues to modern felon-in-possession laws, if any. No inter-
ested organization or member of the academy filed an amicus
brief. All we have are appellate judges' interpretations of the
historical record. And (some of) those interpretations are
credibly accused by actual historians as being a "cherry-
picked" "ideological fantasy." *Id.* at 5 (collecting critiques).[4]

---

[4] This problem has been with us for decades. *See* Antonin Scalia, *Original-
ism: The Lesser Evil*, 57 U. Cin. L. Rev. 849, 856-57, 861 (1989) ("[I]t is often
exceedingly difficult to plumb the original understanding of an ancient
text. Properly done, the task requires the consideration of an enormous
mass of material—in the case of the Constitution and its Amendments, for
example, to mention only one element, the records of the ratifying debates
in all the states. Even beyond that, it requires an evaluation of the reliabil-
ity of that material—many of the reports of the ratifying debates, for ex-
ample, are thought to be quite unreliable. And further still, it requires im-
mersing oneself in the political and intellectual atmosphere of the time—
somehow placing out of mind knowledge that we have which an earlier

This Court then discovered that "an overwhelming majority of historians" reject the Supreme Court's most fundamental Second Amendment holding—its 2008 conclusion that the Amendment protects an individual right to bear arms, rather than a collective, Militia-based right. *Id.* at 4 (quoting Patrick J. Charles, *The "Reasonable Regulation" Right to Arms: the Gun-Rights Second Amendment before the Standard Model*, *in* A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 168 (Tucker, et al., eds., 2019)). "A common theme . . . is historians' frequent complaint that lawyers just can't seem to get it right." *Id.* at 5

---

age did not, and putting on beliefs, attitudes, philosophies, prejudices and loyalties that are not those of our day. **It is, in short, a task sometimes better suited to the historian than the lawyer.** . . . Do you have any doubt that this system does not present the ideal environment for entirely accurate historical inquiry? Nor, speaking for myself at least, does it employ the ideal personnel.") (emphasis added).

As Stephen R. Munzer and James W. Nickel explained even earlier, "practitioners of the historical approach may, consciously or subconsciously, be moved to use slanted or fabricate history to justify results they favor on other grounds." Stephen R. Munzer and James W. Nickel, *Does the Constitution Mean What It Always Meant?*, 77 Colum. L. Rev. 1029, 1033 (1977) (citation omitted).

> Furthermore, it should be noted that there is a special danger in allowing a controversial case to turn on an historical claim if the claim is not beyond dispute. Since good historical research is not within the competence of most judges, the antecedent probability of mistakes is high. This increases the chances that professional historians will challenge and refute the Court's reading of history, thus undermining the basis, or ostensible basis, for the decision.

*Id.* (citation omitted).

10

(quoting Jonathan D. Martin, *Historians at the Gate: Accommodating Expert Historical Testimony in Federal Courts*, 78 N.Y.U. L. Rev. 1518, 1525 (2003)).[5]

After this review, this Court did not want to be guilty of itself cherry-picking the history. It asked the parties whether it should appoint a professional historian to serve as an independent expert in this matter. *Id.* at 6.

The parties answered "no." Mr. Bullock observed that the burden to prove history and tradition is on the government, not the defendant or the Court. Docket No. 70 at 1. "Under *Bruen*, the government's *ipse dixit* fails to carry the government's burden as a matter of law." *Id.* at 2. The government, meanwhile, claimed that "the prohibition against felons possessing firearms is so thoroughly established as to not require detailed exploration of the historical record." Docket No. 71 at 1. The Court took the matter under advisement.

Months later, the government filed several unsolicited briefs. One pointed to more than 120 federal court decisions from across the country that had recently considered and rejected arguments like Mr. Bullock's. The briefs implicitly urged this Court to fall in line. Upon follow-up questioning, however, the government conceded that none of these courts had appointed an expert to help them sift through the historical record, and historians had not filed an amicus brief in any of these cases.

---

[5] Gordon Wood, one of the most prominent historians of our era, acknowledges that we "cannot[] base our constitutional jurisprudence on the historical reality of the Founding." Wood, 39 Ohio N.U. L. Rev. at 448.

11

The Court has now reviewed dozens of the cases proffered by the government. It will describe their analytical approaches later in this opinion.

## II. Legal Standard

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

Mr. Bullock brings an "as-applied" challenge to § 922(g)(1). "The distinction between as-applied and facial challenges is sometimes hazy," *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (citation omitted), but "[a]s-applied challenges are the basic building blocks of constitutional adjudication," Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000).

In an as-applied challenge, the court asks whether a law with some permissible uses "is nonetheless unconstitutional as applied to appellant's activity," *Spence v. Washington*, 418 U.S. 405, 414 (1974) (reversing Mr. Spence's criminal conviction); *see Street v. New York*, 394 U.S. 576, 594 (1969) (reversing Mr. Street's criminal conviction).

In contrast, in a facial challenge, the court asks whether a law "could never be applied in a valid manner." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "Facial challenges to the constitutionality of statutes should be granted sparingly

12

and only as a last resort." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (cleaned up).

"[F]or reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 485 (1989). "Once a case is brought," however, "no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (quoting Fallon, 113 Harv. L. Rev. at 1339).

## III. Discussion

The Second Amendment states, in its entirety: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.

### A. The Second Amendment Revolution

Contemporary Second Amendment law revolves around three Supreme Court decisions: *Heller*, *McDonald*, and *Bruen*. They were issued in 2008, 2010, and 2022, respectively. Each will be summarized below.

Along the way, this Court will explain how the Second Amendment was interpreted before *Heller*, and examine a relevant dissent written by Justice Amy Coney Barrett during her service on the U.S. Court of Appeals for the Seventh Circuit.

The discussion proceeds in chronological order.

### 1. The Standard Before 2008

For 70 years, the Second Amendment was interpreted in accordance with *United States v. Miller*, 307 U.S. 174 (1939). In that case, the Supreme Court determined that "Jack Miller and Frank Layton, two washed-up Oklahoma bank robbers," did not have a constitutional right to carry an unregistered, homemade sawed-off shotgun. Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 NYU J.L. & Liberty 48, 48, 79 (2008).

*Miller* focused on the history and meaning of the word "Militia." "The Constitution as originally adopted granted to the Congress power 'To provide for calling forth the Militia to execute the Laws of the Union'," the Court said. 307 U.S. at 178 (quoting U.S. Const. art. 1, § 8). "With obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." *Id.*

In other words, to quote Justice McReynolds' statement from the bench, "[w]e construe the amendment as having relation to military service and we are unable to say that a sawed-off shotgun has any relation to the militia." Frye, 3 NYU J.L. & Liberty at 67 (citation omitted).

Courts "struggle[d] to decipher [*Miller*'s] holding." *Id.* at 49. "Some find *Miller* adopted an individual right theory of the Second Amendment, some find it adopted a collective right theory, and some find it adopted a hybrid theory, protecting the right to possess a firearm in connection with militia service." *Id.* at 49 & n.4 (collecting cases). Second Amendment

14

scholars, meanwhile, "[a]ll conclude *Miller* is an impenetrable mess." *Id.* at 49.

*Miller* was nevertheless quite resilient. Fifty years on, its Militia-based rationale was described as perhaps "the most firmly established proposition in American constitutional law." Keith A. Ehrman and Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. Dayton L. Rev. 5, 40 (1989). Chief Justice Warren E. Burger endorsed the Militia-based rationale in a 1991 op-ed. *See* Warren E. Burger, *2nd Amendment Has Been Distorted*, Assoc. Press (Dec. 11, 1991). In a television interview that same year, he called efforts to broaden the scope of the Second Amendment "one of the greatest pieces of fraud—I repeat the word fraud—on the American public by special interest groups that I have ever seen in my lifetime." MacNeil/Lehrer NewsHour, *Special Interest Push Behind 2nd Amendment a 'Fraud,' Former Chief Justice Said in 1991*, PBS NewsHour, available at https://www.youtube.com/watch?v=hKfQpGk7KKw. The U.S. Department of Justice agreed with the Militia-based rationale, urging courts to conclude "that the Second Amendment does not apply to individual citizens." *United States v. Emerson*, 270 F.3d 203, 219 (5th Cir. 2001).[6]

All of that was to change in short order.

---

[6] *Emerson* turned out to be a landmark Second Amendment decision. Its historical analysis paved the way for the re-examination and adoption of an individual right to bear arms in *Heller*. It was not without its critics, though. *See Parker v. District of Columbia*, 311 F. Supp. 2d 103, 106-07 (D.D.C. 2004) (calling *Emerson* a "troubling" violation of the Fifth Circuit's rule of orderliness), *rev'd, District of Columbia v. Heller*, 554 U.S. 570 (2008).

15

### 2. *District of Columbia v. Heller*

In 2003, Shelly Parker, Dick Heller, and a handful of other District of Columbia residents sued the D.C. government over its gun restrictions. *See Parker v. District of Columbia*, No. 1:03-CV-213-EGS, Docket No. 1 (D.D.C. Feb. 10, 2003). They sought permission to possess firearms in their homes for self-defense. *Id.* at 3.

The plaintiffs argued that *Miller* had been mischaracterized. Docket No. 3 at 14 (ECF pagination). A true reading of the decision—and history—they maintained, showed that the Second Amendment protected their right to possess common firearms in the home for self-defense, regardless of militia service. *Id.* at 33-39.

The plaintiffs also noted that in late 2001, the U.S. Department of Justice had executed an about-face in its Second Amendment jurisprudence. *Id.* at 29 & n.9. As DOJ later explained to the Supreme Court, a November 2001 memorandum from Attorney General John Ashcroft reflected the Department's new belief. "The Second Amendment," he wrote,

> more broadly protects the rights of individuals, including persons who are not members of any militia or engaged in active military service or training, to possess and bear their own firearms, subject to reasonable restrictions designed to prevent possession by unfit persons or to restrict the possession of types of firearms that are particularly suited to criminal misuse.

Brief for Respondent in Opposition to Certiorari at 19 n.3, Emerson v. United States, 536 U.S. 907 (2002) (No. 01-8780). No explanation was provided for the change.

16

The District Court rejected the plaintiffs' arguments, "thought-provoking and historically interesting" though they were. *Parker v. District of Columbia*, 311 F. Supp. 2d 103, 109 (D.D.C. 2004). More persuasive were "sixty-five years of unchanged Supreme Court precedent and the deluge of circuit case law rejecting an individual right to bear arms not in conjunction with service in the Militia." *Id.* at 109-10.

On appeal, the Supreme Court disagreed. Its analysis began with the plain text of the Second Amendment.

The Court first determined that the phrase "well regulated Militia" was part of the "prefatory clause" that did not limit the words that followed. *Heller*, 554 U.S. at 577-78. It then found that the term "right of the people" creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Lastly, the Court held that "keep and bear arms" means the ability "to possess and carry weapons in case of confrontation." *Id.* at 592. "Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation." *Id.*

The Court sought confirmation of this conclusion in the historical record. It found it. Its review of English history revealed that the Declaration of Rights protected Protestants who wanted to keep their firearms. *Id.* at 593. Blackstone, "the preeminent authority on English law for the founding generation," agreed that the right to bear arms was fundamental. *Id.* at 593-94 (citation omitted). And excerpts from colonial newspapers showed how New Yorkers and Bostonians in 1769 "understood the right to enable individuals to defend themselves." *Id.* at 594. "No prior Supreme Court decision has ever gone to such great depth or length to mine the historical

17

sources in its search for meaning." Rory K. Little, Heller *and Constitutional Interpretation: Originalism's Last Gasp*, 60 Hastings L.J. 1415, 1418 (2009).

The Militia-based reasoning adopted in *Miller* was no obstacle. The case merited no deference simply because "hundreds of judges . . . have relied on the view of the Amendment we endorsed there." *Heller*, 554 U.S. at 621 (cleaned up). Nor was it appropriate to consider whether the Court's new Second Amendment standard would lead to "a dramatic upheaval in the law." *Id.* The Constitution controlled, regardless of the consequences.[7]

The *Heller* Court did pause for a moment to consider a common question: does the Second Amendment protect only "those arms in existence in the 18th century," such as muskets, or does it also protect one's right to bear modern weapons? *Id.* at 582. The Court's response was firm: "We do not interpret constitutional rights that way." *Id.* "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (citations omitted). As support, it pointed to a 1997 case applying the First Amendment to the Internet—a technology unknown to the Framers—and a 2001 case applying the Fourth Amendment to law enforcement's use of an infrared radiation detector. In

---

[7] "Justice Douglas, for example, famously asserted that 'it is the Constitution which [a Justice] swore to support and defend, not the gloss which his predecessors may have put on it.'" Amy Coney Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1925 (2017) (citation omitted).

its own way, the Court was endorsing the oft-stated principle that "[t]he framers of the Constitution wisely spoke in general language and left to succeeding generations the task of applying that language to the unceasingly changing environment in which they would live." William H. Rehnquist, *The Notion of A Living Constitution*, 54 Tex. L. Rev. 693, 694 (1976); *see also N.L.R.B. v. Noel Canning*, 573 U.S. 513, 533-34 (2014) ("The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries. After all, a Constitution is 'intended to endure for ages to come,' and must adapt itself to a future that can only be 'seen dimly,' if at all.").

Finally, the Court offered a few caveats and assurances. "Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," the Court assured us. *Id.* at 635.

19

As a result, Ms. Parker, Mr. Heller, and their fellow plaintiffs were permitted to register and maintain their handguns in their homes. *Id.*

### 3. *McDonald v. City of Chicago, Illinois*

Two years later, the Supreme Court issued *Heller*'s sequel: *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010).

*McDonald* solved a simple but important legal problem. Technically, the Court's decision in *Heller* applied solely against the federal government. (Recall that the District of Columbia is a federal territory.) Residents of the 50 states still did not have full Second Amendment rights. So after *Heller*, Chicago resident Otis McDonald, several other Chicagoans, and two advocacy groups filed suit seeking the same guarantee as D.C. residents: the right "to keep handguns in their homes for self-defense." *Id.* at 750 and 752.

Although the plaintiffs lost in the District Court and the Seventh Circuit, the Supreme Court found in their favor. "[T]he Second Amendment right is fully applicable to the States" through the Fourteenth Amendment, it held. *Id.* at 750. "Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless *stare decisis* counsels otherwise, that guarantee is fully binding on the States."[8] *Id.* at 784-85.

As in *Heller*, the *McDonald* Court engaged at length with the history of restricting gun possession. *See id.* at 771-79. Because the critical Amendment this time was the Fourteenth

---

[8] The Court's commitment to *stare decisis* has been called into question of late. *See, e.g.,* David Litt, *A Court Without Precedent*, The Atlantic (July 24, 2022).

Amendment, rather than the Second Amendment, much of this discussion highlighted the "extensive history of black people's inability to access guns during the days of chattel slavery, Reconstruction, and Jim Crow--an incapacity that left black people vulnerable to violence from private actors." Khiara M. Bridges, *Foreword: Race in the Roberts Court*, 136 Harv. L. Rev. 23, 77 (2022).[9]

Relying on legislative history, the Court recounted how racist violence and disarmament was particularly acute in Mississippi. Said one U.S. Senator of that era, "[i]n Mississippi rebel State forces, men who were in the rebel armies, are traversing the State, visiting the freedmen, disarming them, perpetrating murders and outrages upon them; and the same things are done in other sections of the country." *McDonald*, 561 U.S. at 772 (quotation marks and citation omitted).

Justice Thomas' concurrence also focused on Mississippi. He reminded readers of "Klan tactics" and thousands of lynchings across the South, including Emmitt Till's 1955 murder near Money, Mississippi, and the 1904 mutilation and lynching of a "Negro and Wife" near Vicksburg, Mississippi. *Id.* at 857 (Thomas, J., concurring). "The use of firearms for self-

---

[9] As Judge Berger observes, "[i]n 1791, the drafters of the Constitution considered the undersigned's ancestors as legal property. They, along with free Blacks, were prohibited from possessing firearms. The popular conception of the Second Amendment at the time it was enacted clearly did not encompass *all* people having access to firearms to defend themselves and fight for freedom from tyranny." *United States v. Nutter*, 624 F. Supp. 3d 636, 645 n.10 (S.D.W. Va. 2022); *see also Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857) (rejecting interpretation of Constitution that would permit "persons of the negro race . . . to keep and carry arms wherever they went.").

defense was often the only way black citizens could protect themselves from mob violence," he concluded. *Id.*

The Court majority wrapped up by reiterating some of its earlier rhetoric:

> We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.

*Id.* at 786 (citation omitted). But the holding was clear: Mr. McDonald and his neighbors could keep their handguns at home.

### 4. Judge Barrett's Dissent in *Kanter v. Barr*

Here, our discussion deviates from Supreme Court cases to cover a dissent written by then-Judge Barrett of the U.S. Court of Appeals for the Seventh Circuit. Its relevance will soon become obvious.

In 2011, Wisconsin resident Rickey Kanter pleaded guilty to federal mail fraud, a felony. *Kanter v. Barr*, 919 F.3d 437, 440 (7th Cir. 2019). He had defrauded Medicare. *Id.* He paid a $50,000 criminal penalty, "reimbursed Medicare over $27 million in a related civil settlement," and served a year in federal prison. *Id.*

Mr. Kanter's conviction, like Mr. Bullock's, meant he was unable to ever again possess firearms or ammunition. Both the

federal government and the State of Wisconsin had felon-in-possession laws that threatened to return Mr. Kanter to prison if he ever knowingly possessed those things. *See* 18 U.S.C. § 922(g)(1); Wis. Stat. § 941.29(1m).

Mr. Kanter believed that the Second Amendment invalidated those statutes. He filed suit in federal court seeking a declaration that they were unconstitutional as applied to him, "a non-violent offender with no other criminal record." *Kanter*, 919 F.3d at 440.

The District Court disagreed. It found that "even assuming felons are entitled to Second Amendment protection, the application of the federal and Wisconsin felon dispossession laws to Kanter is substantially related to the government's important interest in preventing gun violence." *Id.*

This was a curious conclusion. Both *Heller* and *McDonald* expressly instructed lower courts not to engage in this kind of "interest-balancing." *See Heller*, 554 U.S. at 634; *McDonald*, 561 U.S. at 791. Both decisions even used the same sentence of reasoning: "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634; *McDonald*, 561 U.S. at 791 (citation omitted). So it is not clear why "the government's important interest in preventing gun violence" was relevant. *Kanter*, 919 F.3d at 440.

The Seventh Circuit nevertheless affirmed. The federal government had articulated an interest in "preventing gun violence by keeping firearms away from persons, such as those convicted of serious crimes, who might be expected to misuse them," and then demonstrated "that prohibiting even

23

nonviolent felons like Kanter from possessing firearms is substantially related to its interest in preventing gun violence." *Id.* at 448. That was enough. Mr. Kanter would remain subject to both the federal and state felon disarmament statutes.

Judge Barrett issued a lengthy dissent. She thought the majority had proceeded down the wrong path by emphasizing Mr. Kanter's felony. The correct vector was whether he was "*dangerous.*" *Id.* at 451 (Barrett, J., dissenting). "In 1791—and for well more than a century afterward—legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety," she reasoned. *Id.* "Absent evidence that he either belongs to a dangerous category or bears individual markers of risk, permanently disqualifying Kanter from possessing a gun violates the Second Amendment." *Id.*

Judge Barrett began with *Heller*. She observed that *Heller* defined "the people" protected by the Second Amendment as "all Americans." *Id.* at 453 (citation omitted). "Neither felons nor the mentally ill are categorically excluded from our national community." *Id.* As a result, persons like Mr. Kanter were presumptively protected by the Second Amendment. *Id.*

The Judge then asked whether *Heller* foreclosed an in-depth examination of felon disarmament laws. It did not. "Like the majority, I am reluctant to place more weight on these passing references than the Court itself did. The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear." *Id.* (cleaned up). In short, "*Heller*'s dictum does not settle the question before us." *Id.* at 454.

24

Next came an exhaustive historical analysis. After examining several state ratifying conventions, Judge Barrett found no "founding-era laws explicitly imposing [] or explicitly authorizing the legislature to impose" permanent felon disarmament laws. *Id.* at 454. Each ratifying convention lent some support to a tangential proposition; New Hampshire's proposal, for example, "reflects support for disarming rebels." *Id.* at 455. But that proposal didn't "say anything about disarming those who have committed other crimes," and, to be clear, the proposal never made it into the final authoritative text. *Id.* Similar conclusions followed for the Massachusetts and Pennsylvania conventions. "The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Id.* at 456.

Judge Barrett then turned to English common law and colonial American history. In those periods, persons in power feared Catholics, Native Americans, and African-Americans, and disarmed those groups. *Id.* at 456-57. "It should go without saying that such race-based exclusions would be unconstitutional today," she added.[10] *Id.* at 458 n.7. But those restrictions provided no support for the categorical disarmament of persons with felony convictions.

Judge Barrett next considered whether felon disarmament laws are constitutional because founding-era felonies were punishable by death. *Id.* at 458-59. (Other judges have latched

---

[10] "It cannot be that historical error in the form of impermissible bias, even if once acceptable among those with political and economic power, could provide the government a continuing license to unfairly discriminate against a group of people, whether it be in restricting Second Amendment rights or any others." *United States v. Guthery*, No. 2:22-CR-173-KJM, 2023 WL 2696824, at *8 (E.D. Cal. Mar. 29, 2023).

25

onto this rationale, which we will return to later.) She found this too simplistic. By the time of ratification, the death penalty "no longer inevitably followed a felony conviction," while "civil death[11] applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights." *Id.* at 459 and 461.

Continuing, Judge Barrett tackled the so-called "virtuous citizenry" theory. This theory provides that gun rights extend only to the virtuous, and because persons with felony convictions are not virtuous, they can be disarmed. The Judge found historical evidence that "felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous

---

[11] The historic practice of "civil death" "extinguished most civil rights of a person convicted of a crime and largely put that person outside the law's protection. Civil death as an [American] institution faded away in the middle of the twentieth century," but has arguably "reemerged" via a panoply of modern "collateral consequences." Chin, 160 U. Pa. L. Rev. at 1790. In addition to disarmament,

> A person convicted of a crime, whether misdemeanor or felony, may be subject to disenfranchisement (or deportation if a noncitizen), criminal registration and community notification requirements, and the ineligibility to live, work, or be present in a particular location. Some are not allowed to live outside of civil confinement at all. In addition, the person may be subject to occupational debarment or ineligibility to establish or maintain family relations.

*Id.* (citations omitted). "The magnitude of the problem is greater than ever"; "tens of millions" of Americans live in free society but have criminal records. *Id.* at 1791 (citations omitted).

citizens." *Id.* at 462 (citations omitted). The problem, though, is that virtue exclusions applied only to "civic rights—individual rights that require citizens to act in a collective manner for distinctly public purposes." *Id.* (cleaned up). And *Heller* made clear that the Second Amendment's right to bear arms is an individual right, not a civic right. *Id.* at 463.

Judge Barrett concluded by asking whether some firearms bans could be justified. In her view, the federal government and Wisconsin "might still be able to show that Kanter's history or characteristics make him likely to misuse firearms," thereby posing a risk to public safety that warranted disarmament. *Id.* at 468. But neither government had put forward any such evidence. *Id.* Accordingly, "the governments cannot permanently deprive him of his right to keep and bear arms." *Id.* at 469.

**5.** *New York State Rifle & Pistol Association v. Bruen*

We arrive at *Bruen*. The decision was summarized earlier, but the three major takeaways of the majority opinion are presented here. A shorter description of the concurrences and dissent follows.

*First*, in its opening paragraph, the Court built upon *Heller* and *McDonald* by formally holding "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside* the home." 142 S. Ct. at 2122 (emphasis added). The opinion later explained that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 2134. "To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.* at 2134-35.

27

*Second*, the Court modified the legal standard governing Second Amendment cases. It rejected the appellate courts' existing "'two-step' framework . . . that combines history with means-end scrutiny," *id.* at 2125, and replaced it with a different two-step analysis:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id.* at 2129-30 (citation omitted).

The Court explained to judges and lawyers how to use "history to inform the meaning of constitutional text." *Id.* at 2130. "That 'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." *Id.* at 2130 n.6 (quoting William Baude and Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810-11 (2019)).[12] The Court then added that judges should "follow the principle of party presentation" and are "entitled to decide a case based on the historical record compiled by the parties." *Id.*

---

[12] The authors of the quoted piece, though, state emphatically at the outset of their article that "lawyers must often defer to historical expertise on the relevant questions." Baude and Sachs, 37 L. & Hist. Rev. at 3 (PDF pagination).

At times, the historical inquiry would be "fairly straightfor-
ward." *Id.* at 2131. "For instance, when a challenged regula-
tion addresses a general societal problem that has persisted
since the 18th century, the lack of a distinctly similar historical
regulation addressing that problem is relevant evidence that
the challenged regulation is inconsistent with the Second
Amendment."[13] *Id.*

At other times, though, it acknowledged that "cases implicat-
ing unprecedented societal concerns or dramatic technologi-
cal changes may require a more nuanced approach." *Id.* at
2132.

> The regulatory challenges posed by firearms to-
> day are not always the same as those that pre-
> occupied the Founders in 1791 or the Recon-
> struction generation in 1868. Fortunately, the
> Founders created a Constitution—and a Second
> Amendment—"intended to endure for ages to
> come, and consequently, to be adapted to the
> various crises of human affairs." Although its
> meaning is fixed according to the understand-
> ings of those who ratified it, the Constitution
> can, and must, apply to circumstances beyond
> those the Founders specifically anticipated.

*Id.* (citation omitted).

The Court then tried to provide lawyers and judges specific
instructions. "[D]etermining whether a historical regulation is

---

[13] Some scholars doubt that the absence of a similar historical regulation
should weigh against constitutionality. *See, e.g.,* Jacob D. Charles, *The Dead
Hand of a Silent Past:* Bruen, *Gun Rights, and the Shackles of History*, 73 Duke
L.J. ___ (draft of March 20, 2023) (forthcoming).

a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar,'" it said. *Id.* While "relevantly similar" was left undefined, the Court said precedent pointed toward "at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (emphasis added). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

*Third*, the Court applied this new legal standard to New York's public-carry licensing regime.

At step one, it found that "the plain text of the Second Amendment protects [petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134.

At step two, the Court found that the State of New York had not met its burden "to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. Although the government had amassed "a variety of historical sources" spanning "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries," these sources all failed to persuade. *Id.* at 2135-36. "[A]part from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. New York's proper-cause requirement was unconstitutional.

*Bruen*'s concurrences and dissent merit attention. As we will see, the concurrences and dissent are the primary reason why more than 120 constitutional challenges like Mr. Bullock's have failed across the country.

Justice Alito's concurrence emphasized that *Bruen* protects only the rights of "law-abiding residents." *Id.* at 2157 (Alito, J., concurring). "That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. . . . Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.*

Justice Kavanaugh's concurrence, which was joined by the Chief Justice, took a similar tack. Quoting *Heller* and *McDonald*, he emphasized that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J., concurring).

Justice Breyer's dissent, joined by Justices Sotomayor and Kagan, hit the same theme. He observed that in *Heller*, the Court declared felon-in-possession statutes to be "presumptively lawful." *Id.* at 2189 (Breyer, J., dissenting) (quoting *Heller*, 554 U.S. at 626-27 & n.26). He then agreed with Justice Kavanaugh that *Bruen* "cast[s] no doubt on that aspect of *Heller*'s holding." *Id.* (citation omitted).

U.S. District Judges across the country have latched onto the concurrences and dissent to conclude that at least five current Supreme Court Justices presently support felon-in-possession statutes. We turn now to those district court opinions.

31

### B.   The Post-*Bruen* Consensus

This Court has now reviewed dozens of the government's proffered post-*Bruen* cases. All have found § 922(g)(1) constitutional.

The most common mode of reasoning goes like this:

- *Heller* protected only the Second Amendment rights of "law-abiding, responsible" citizens.
- *Heller* said that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."
- *McDonald* said the same thing.
- *Bruen* didn't overrule either case.
- Because the defendant is a felon, under *Heller*, *McDonald*, and *Bruen*, their motion to dismiss fails.

*See, e.g.*, *United States v. Tribble*, No. 2:22-CR-85-PPS-JEM, 2023 WL 2455978, at *2 (N.D. Ind. Mar. 10, 2023). The *Tribble* court summarized its reasoning as follows:

> As tempting as it is to pore over colonial era gun laws and muse on whether they are an adequate proxy to § 922(g)(1), . . . the Supreme Court has stated that restrictions on felons possessing firearms are permissible. Nothing in *Bruen* indicates the Court intended to change its view on the matter.

*Id.* (citations omitted). The *Tribble* court then cited the concurrences of Justices Alito and Kavanaugh for the proposition that *Bruen* changed the legal standard without casting doubt on felon disarmament. *Id.* (citations omitted).

32

Some district courts have gone beyond this method to examine the constitutionality of § 922(g)(1) under the *Bruen* standard.

Those who reach *Bruen* step one have reasoned, for example, that "the activity regulated by the felon in possession statute falls outside the scope of the Second Amendment's protections because it does not impact 'law-abiding, responsible citizens.'" *United States v. Belin*, No. 21-CR-10040-RWZ, 2023 WL 2354900, at *2 (D. Mass. Mar. 2, 2023) (quoting *Bruen*, 142 S. Ct. at 2122).

The courts that reach *Bruen* step two, meanwhile, have credited the United States' arguments to conclude that "felon-in-possession prohibitions have sufficient grounding in historical tradition to withstand a challenge." *United States v. Smith*, No. 22-CR-20351, 2023 WL 2215779, at *3 (E.D. Mich. Feb. 24, 2023). In *Smith*, as just one example, the court cited the Fifth Circuit's discussion in *Emerson* for the proposition that "colonial and English societies of the eighteenth century have excluded felons from possessing firearms." *Id.* (cleaned up). A subset of these decisions has also reasoned that because the government could historically disarm persons it deemed "dangerous"—crediting Justice Barrett's dissent in *Kanter*—that the government could also disarm all persons with felony convictions. *Id.* at *4.

### C.  Concerns With the Post-*Bruen* Consensus

With great respect, this Court is not convinced that these analyses are correct. The concerns are both procedural and substantive.

33

### 1. The Process Concerns

The Department of Justice admits that in none of its proffered cases did a district court decide the issue with assistance of a professional historian. That is puzzling because such assistance could have come in several forms.

### a. No Expert Reports

The most disappointing failure is that the party with the burden to prove history and tradition—the United States—did not designate a historian to testify on the analogues, if any, to modern felon-in-possession laws.

In footnote six, *Bruen* explained that judges should "follow the principle of party presentation" and are "entitled to decide a case based on the historical record compiled by the parties." 142 S. Ct. at 2130 n.6. Judges "are not obliged to sift the historical materials for evidence to sustain New York's statute," it reasoned. *Id.* at 2150. "That is [the government's] burden." *Id.*

In this case, as in the sampled cases, however, the government did not designate a single person to provide an expert report on § 922(g)(1). It is true that a retained expert would have come at some cost.[14] But the Rules also permit parties to designate their own employee as an expert witness. *See* Fed. R.

---

[14] Although compared to the doctors hired in medical malpractice cases, the engineers hired in product liability cases, the political scientists and statisticians hired in voting rights litigation, and the economists hired in cases of all stripes, the historians who sent their CVs to this Court, unprompted, appear to charge affordable rates. And if fundamental constitutional rights are at stake, isn't some degree of cost worth it?

Civ. P. 26(a)(2)(B). The government elected to do neither of those things.[15]

*Bruen*'s sixth footnote brushed aside questions about the role of experts. It said "[t]he job of judges . . . is to resolve *legal* questions presented in particular cases or controversies." 142 S. Ct. at 2130 n.6. It then quoted Professors Baude and Sachs to explain that this "'legal inquiry is a refined subset' of a broader 'historical inquiry,' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." *Id.* The quoted article, in turn, observes that judges "hear antitrust cases without producing cutting-edge microeconomic research, or decide issues of toxic-tort causation without ever donning lab coats." PDF p.8. Professors Baude and Sachs thus imply that historical questions pose no greater lift.

With respect, however, the distinguished professors forget that in antitrust, toxic-tort, and many more cases, the parties each submit detailed expert reports supporting their positions. In this way Judges draw not upon their own subject-matter expertise, but upon a record produced by the parties'

---

[15] In some circumstances, the Department of Justice can and does employ real historians. In May 2023, as this opinion was being drafted, the Criminal Division's Human Rights and Special Prosecutions Section at Main Justice was hiring a historian at the GS-14 level. The successful applicant will be expected to "[p]erform historical research and investigative activities to identify persons in the United States who may have perpetrated human rights violations in Eastern Europe, including persecution, torture, genocide, extrajudicial killings, and the use or recruitment of child soldiers." USAjobs Posting (on file with author). The Department could do the same for its Second Amendment cases if it wanted to.

own presentations.[16] And in this case, as in the sampled cases, the government never offered into the record an expert report supporting its view of felon disarmament.[17]

### b. No Amicus Briefs

The sampled district court cases, like this case, also lack amicus briefs discussing past analogues (if any) to modern felon disarmament laws.

This is understandable at the district court level. With no Rule requiring their acceptance, *cf.* Fed. R. App. P. 29, some district courts discourage amicus briefs. *See, e.g.*, *Evanston Ins. Co. v. Rodriguez Eng'g Lab'ys*, No. 1:21-CV-1129-RP, 2023 WL 379277, at *1 (W.D. Tex. Jan. 20, 2023) ("An amicus who argues facts should rarely be welcomed. Additionally, acceptance of an . . . amicus curiae should be allowed only sparingly, unless the amicus has a special interest, or unless the Court feels that existing counsel need assistance.") (collecting cases).

This reluctance is much less true at the appellate level, where in addition to the requirements of Rule 29, Circuit Judges from a wide range of philosophical dispositions have recognized that "'we might be able to avoid some unnecessary catastrophes if we have the will and the patience to listen.'" *Lefebure v. D'Aquilla*, 15 F.4th 670, 675 (5th Cir. 2021) (Ho, J., in

---

[16] At the trial-court level, moreover, a judge is more often expected to determine whether there are genuine and material disputed issues of fact for *a jury* to resolve, rather than asked to itself adjudicate those facts.

[17] While this Court was initially tempted to appoint an independent historian to help complete the historical record—for reasons well-articulated by Justice Scalia more than three decades ago, *see supra*—*Bruen* instructs judges to place that burden on the government. It is no wonder, then, that this Court's colleagues all declined to hire such an expert.

a single-judge Order) (quoting Judge Higginbotham's dissent in *Am. Coll. of Obstetricians & Gynecologists, Pennsylvania Section v. Thornburgh*, 699 F.2d 644, 647 (3d Cir. 1983)).

Despite the appellate courts' openness to outside expertise, however, the amicus briefs do not always materialize. Fifth Circuit Judge Stephen Higginson recently lamented that despite the importance of the Second Amendment issue pending before his court, he and his colleagues had the benefit of only one amicus brief. Avalon Zoppo, *Judge Frustrated Over Lack of Historical Analysis in Gun Rights Case*, Nat'l L.J. (Feb. 8, 2023). "I'm not blaming you because I'm not a Ph.D. either," he told counsel for the United States during oral argument, "but you each gave us I think four law review articles not from historians. . . . The Supreme Court in *Bruen* had 80 amici from Ph.D. historians." *Id.* In such situations, what are Circuit Judges to do?

Judge Higginson's grievance might seem strange to lawyers. *Of course historians will want to provide their input into critical Second Amendment questions*, we think. From the historians' perspective, though, the question might be different. What incentive do trained historians have to participate in what is ultimately an uncompensated labor scheme?

Consider, as a start, Justice Scalia's stated distrust of "[s]ign-on, multiple-professor amicus briefs," quoted above. Think about how the Chief Justice famously derides academics, who (in his view) spend their time on "the influence of Immanuel Kant on evidentiary approaches in 18th Century Bulgaria, or something."[18] Debra Cassens Weiss, *Law Prof Responds After*

---

[18] Legal academia responded with a flurry of papers. Westlaw returns 126 secondary sources containing the phrase "influence of Immanuel Kant on

*Chief Justice Roberts Disses Legal Scholarship*, ABA Journal (July 7, 2011). And recall that "an overwhelming majority of historians" reject the Supreme Court's central Second Amendment holding: the individual right to bear arms. *Bullock*, 2022 WL 16649175, at *2 (citation omitted). If you believe that an outcome-oriented judiciary is disregarding your profession's collective wisdom, cherry-picking the record to legislate from the bench, why would you want to enable it?[19]

One hopes that we have not so abused the academic world's trust as to discourage it from participating in the judiciary's search for truth.[20] We need the historical community's guidance and expertise. And to accomplish that, we might need to rearrange the incentive scheme. Not just by paying people what they are worth, but also by ensuring that historical

---

evidentiary approaches." *See, e.g.,* Orin S. Kerr, *The Influence of Immanuel Kant on Evidentiary Approaches in 18th-Century Bulgaria,* 18 Green Bag 2d 251, 251 (2015) ("This Article fills the gap in the literature by exploring Kant's influence on evidentiary approaches in 18th-century Bulgaria. It concludes that Kant's influence, in all likelihood, was none.").

[19] Professor Wood acknowledges that that's exactly what is happening, asking, "how can you go back to the history *except* to cherry pick and select phrases or words that seem to fit your agenda?" Wood, 39 Ohio N.U. L. Rev. at 443 (emphasis added).

[20] This Court may be understating the problem. A recent paper suggests that the Justices' use of scholarly literature is "a dangerous development" and "poses acute problems for students of legal history." Andrea Scoseria Katz & Noah A. Rosenblum, *Removal Rehashed,* 136 Harv. L. Rev. F. 404, 426-27 (2023). "Scholars cannot put their trust in the Court's historical analyses. We need rigorous academic work that stands at some distance from the Court's own arguments on which to build our future research." *Id.* at 427.

questions are predicated upon a solid foundation of facts, not abstract legal questions reserved only for judges.

The justice system ordinarily operates like a pyramid. Thousands of disparate factual records are created in the trial courts. Thousands of those filter up to the circuit courts for error-correction and harmonization of the rule of law. And customarily, where that harmonization causes differences among the circuit courts will the Supreme Court weigh in to decide the contested issues. When it does so, the parties are given the opportunity to argue their respective positions, and amici weigh in too. The parties have one last opportunity to convince the Court at oral argument, and on some occasions the Court permits others to speak. In this way, many different facts, situations, and perspectives inform the law up the chain of abstraction.

In Second Amendment cases, though, the pyramid is turned on its head. The trial record can be nonexistent. None of the history is "tested in an adversarial proceeding," *Roper*, 543 U.S. at 617 (Scalia, J., dissenting), and there may be no factual findings that ordinarily would receive some form of deference. The appellate courts do the best with the briefs they have, but all that matters is the Supreme Court's historical review, conducted de novo as a legal rather than a factual question, with dozens of amicus briefs never before seen by another court.[21] Is this the best way of doing justice?

---

[21] In that sense, historians are simply making the most *efficient* decision: don't bother to submit anything to the trial or intermediate courts—it doesn't matter anyway.

## 2. The Substantive Concerns

This Court is also not persuaded that the sampled district court cases reached the correct legal conclusions.

### a. Relying on Dicta

One common method of denying these motions relies upon *Heller*'s repeated statements about "law-abiding, responsible citizens" and a concluding paragraph saying that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." 554 U.S. at 626-27.

Several commentors did not like this paragraph of "judicial lawmaking." J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 273 (2009); *see* Antonin Scalia, A Matter of Interpretation 21 (1997) (criticizing "judicial lawmaking") [hereinafter *A Matter of Interpretation*]. "The Constitution's text, at least, has as little to say about restrictions on firearm ownership by felons as it does about the trimesters of pregnancy," Judge Wilkinson wrote. 95 Va. L. Rev. at 273. "The *Heller* majority seems to want to have its cake and eat it, too--to recognize a right to bear arms without having to deal with any of the more unpleasant consequences of such a right." *Id.* Professor Little thought the paragraph "demonstrates that even the purest originalist cannot resist the tug to implement, nay, to transport, the 'original meaning' into the context and experience of our living age." 60 Hastings L.J. at 1420. Professor Larson added, "[t]he Court offered no citations to support this statement, and its ad hoc, patchy quality has been readily apparent to commentators, who have speculated that it was compromise language designed to secure Justice Kennedy's vote." Carlton F.W. Larson, *Four*

*Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1372 (2009).

Like Justice Barrett, the Fifth Circuit found this language to constitute dictum. *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010). Justice Thomas has agreed. *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting). And quite recently, the en banc Third Circuit agreed, too. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc).

"A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment. If not a holding, a proposition stated in a case counts as dicta." Michael Abramowicz and Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 961 (2005).

"The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (cleaned up). "*Heller*'s dictum does not settle the question before us." *Id.*

Several district courts suggested that Supreme Court dicta is binding upon them. *E.g.*, *United States v. Finney*, No. 2:23-CR-13, 2023 WL 2696203, at *2 n.4 (E.D. Va. Mar. 29, 2023). Not so in this Circuit. "We are not bound by dicta, even of our own court," says the Fifth Circuit. *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) (citation omitted). Though Supreme Court dicta is, "as compared with other dicta, . . . 'another matter,'" it is "'not infallible.'" *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (citations omitted). And for good reason. Federal courts have "no jurisdiction to

pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." *United States v. Raines*, 362 U.S. 17, 21 (1960).

Federal courts are instead bound by two rules: "one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.*; *see Yazoo & M.V.R. Co. v. Jackson Vinegar Co.*, 226 U.S. 217, 219 (1912) ("this court must deal with the case in hand, and not with imaginary ones.").

Treating dicta as binding violates the "one doctrine more deeply rooted than any other in the process of constitutional adjudication": "that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944). Lower courts cannot apply language that is, at heart, an unconstitutional advisory opinion. *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 343 (5th Cir. 2010) (Garza, J., concurring in part) ("Federal courts are only permitted to rule upon an actual 'case or controversy,' and lack jurisdiction to render merely advisory opinions beyond the rulings necessary to resolve a dispute."); *see also* Ryan S. Killian, *Dicta and the Rule of Law*, 2013 Pepp. L. Rev. 1, 9 (2013) ("Dicta is, at bottom, a form of advisory opinion for future cases.").

*Heller* instead reassured us that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. After *Bruen*, that time has arrived.

42

### b. Counting the Votes

Another common method of denying these motions is to tally the felon-in-possession votes implied by *Bruen*'s concurrences and dissent. Recall that in these separate opinions, six Justices endorsed felon disarmament. Five of those Justices are still on the Court.[22] As a result, some district courts have assumed

---

[22] After *Bruen*, Justice Breyer was replaced by Justice Jackson, so some might assume that there are six votes supporting felon disarmament—Roberts, Alito, Sotomayor, Kagan, Kavanaugh, and Jackson. That would be unwise, and not just because it is insulting to assume anyone's vote.

Justice Jackson is a former public defender. And many public defenders consider § 922(g)(1) and its state analogues to be canaries in the coal mine of our criminal justice system, disenfranchising minorities and exacerbating mass incarceration. *See* Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing A Status, Disparately Affecting Black Defendants, and Continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143, 175 (2018) ("'Felon in possession' laws . . . are disparately enforced against Black defendants, and federal initiatives that charge offenders in the federal rather than state system target Black communities."); David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 Emory L.J. 1011, 1015 (2020) (collecting critiques of federal gun possession prosecutions, "including stark racial disparity, contribution to mass incarceration, harm to principles of federalism, diminished civil liberties, and lack of effectiveness"); *see also* Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173, 2194 (2016) ("while fewer published studies focus on the racial dynamics of criminal gun law, the evidence that we do have suggests that people of color bear the brunt of enforcement.").

In *Bruen*, a coalition of public defenders and Black criminal defense attorneys filed an amicus brief supporting the petitioners. They argued that "virtually all our clients whom New York prosecutes for exercising their Second Amendment right are Black or Hispanic. And that is no accident. New York enacted its firearm licensing requirements to criminalize gun ownership by racial and ethnic minorities. That remains the effect of its enforcement by police and prosecutors today." Brief of Black Attorneys of

43

that as a simple matter of realpolitik, there is no chance the Supreme Court will find § 922(g)(1) unconstitutional in a future case. *E.g.*, *United States v. Davis*, No. 1:21-CR-206-ADA-BAM-1, 2023 WL 2505039, at *3 (E.D. Cal. Mar. 14, 2023).

It certainly is tempting for busy trial judges to try and resolve complicated issues via this kind of calculation. But this Court cannot honor an advisory opinion on an issue that was not before the Supreme Court. And it is no substitute for applying

---

Legal Aid et al. as *Amici Curiae* in Support of Petitioners at 5. These attorneys pointed out that although the State of New York is approximately 70% white and 18% Black, white residents accounted for only 7% of felony gun possession cases. *Id.* at 14-15. In contrast, Black residents "accounted for 78% of the state's felony gun possession cases." *Id.* at 14. In New York City in particular, data showed that "in 2020, 96% of arrests made for gun possession under N.Y. Penal Law § 265.03(3) . . . were of Black or Latino people. This percentage has been above 90% for 13 consecutive years." *Id.* at 15.

National data on § 922(g) convictions bear this trend out. In FY 2021, there were 7,454 § 922(g) convictions, representing approximately 13% of all federal cases that year. U.S. Sent. Comm'n, Quick Facts – Felon in Possession of a Firearm at 1 (June 2022), *available at* https://www.ussc.gov/research/quick-facts/section-922g-firearms. Most of these cases were felon-in-possession cases, and they had an average sentence of 60 months' incarceration. *Id.*

Of the individuals convicted of violating § 922(g), 56.2% of them were Black. *Id.* That same year, though, the population of the United States was 12.1% Black. U.S. Dep't of Health and Human Servs., Office of Minority Health, *Profile: Black/African Americans* (last modified Feb. 24, 2023). African-Americans' share of § 922(g) convictions is therefore over four times their representation in the national population. The result is that "nearly a quarter of Black adults have been permanently stripped of the right to lawfully possess firearms." Zach Sherwood, *Time to Reload: The Harms of the Federal Felon-in-Possession Ban in A Post-Heller World*, 70 Duke L.J. 1429, 1464 (2021).

the new legal standard announced in *Bruen*. Believing it to be insufficient, then, this Court will refrain from counting the Justices' votes today.[23]

### c. *Bruen* Step One

Some courts press on to consider § 922(g) under the *Bruen* standard. Recall that *Bruen*'s first step asks reviewing courts to determine whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126.

In one representative decision, the district court denied the defendant's motion to dismiss by reasoning at step one that "the activity regulated by the felon in possession statute falls outside the scope of the Second Amendment's protections because it does not impact 'law-abiding, responsible citizens.'" *Belin*, 2023 WL 2354900, at *2 (quoting *Bruen*, 142 S. Ct. at 2122). In other words, a convicted felon "is not considered to be a part of 'the people' for purposes of the Second Amendment as the Amendment's protections only extend to law-abiding citizens. . . . [T]his is known as the civic virtue theory of the Second Amendment." *United States v. Rice*, No. 3:22-CR-36 JD, 2023 WL 2560836, at *6 (N.D. Ind. Mar. 17, 2023) (citations omitted).

With respect, this reasoning errs in several ways.

*Bruen* step one requires us to look at the "conduct" being regulated, not the status of the person performing the conduct. 142 S. Ct. at 2126. In Mr. Bullock's case, the conduct the

---

[23] For those so inclined, it is fascinating that the Justice with arguably the most knowledge of felon disarmament—or, at least, the longest paper trail on the subject—declined to join Justice Alito and Justice Kavanaugh's attempts to reassure us that felon-in-possession laws are constitutional.

government seeks to punish is Mr. Bullock's (alleged) knowing possession of a firearm in his home. It hasn't charged him with brandishing a weapon, firing one, domestic violence, assault, or battery. And *Heller* already resolved that merely possessing a firearm within the home is the core of the right protected by the Second Amendment. *See* 554 U.S. at 629-30.

*Heller* also answered, for the purposes of step one, whether the Second Amendment covers the so-called "national community," or a subset of the Nation called the "political community." It chose the broader definition: "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* at 580 (cleaned up). "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581.[24]

The en banc Third Circuit, relying on this part of *Heller*, concluded that persons with felony convictions are part of "the people" and presumptively retain Second Amendment rights. *Range*, 69 F.4th at 101. As that court explained,

---

[24] As Justice Barrett observed, "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting). And even if the Supreme Court eventually backtracks from *Heller* to hold that the Second Amendment protects only the "political community" rather than the larger "national community," Justice Barrett's dissent identified case law proximate to the adoption of the Fourteenth Amendment showing that persons with felony convictions who had completed their sentences had their civil rights *restored*, thereby returning them to the political community. *Id.* at 461.

the phrase "law-abiding, responsible citizens" is as expansive as it is vague. Who are "law-abiding" citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No. . . . As the Supreme Court noted recently: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, —— U.S. ——, 141 S. Ct. 2011, 2020 (2021) (cleaned up). As for the modifier "responsible," it serves only to undermine the Government's argument because it renders the category hopelessly vague. In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a "responsible" citizen.

*Id.* at 102. This Court agrees.

Writing in a Second Amendment case last year, Judge David Counts made another essential point:

[Step One] is where *Bruen* conflicts with *Heller. Heller* called proscriptions against felons possessing guns "presumptively lawful." In contrast, because possession is covered by the Second Amendment's plain text, *Bruen* makes a felon's possession of a firearm "presumptively constitutional." *Bruen* is the controlling standard, but this conflict—the presumption of constitutionality—is what places the heavy burden on the Government.

47

In any event, *Bruen*'s first step asks a strictly tex-
tual question with only one answer: the Second
Amendment's plain text covers possession of a
firearm. Because the Constitution presump-
tively protects possessing a firearm,
§ 922(g)(1)'s constitutionality hinges on
whether regulations prohibiting felons from
possessing a firearm are consistent with the Na-
tion's historical tradition of firearm regulation.

*United States v. Charles*, No. MO:22-CR-154-DC, 2022 WL
4913900, at *2 (W.D. Tex. Oct. 3, 2022) (citations omitted).

For these reasons, this Court finds that at *Bruen* step one, the
plain text of the Second Amendment covers Mr. Bullock's
possession of firearms in his home.[25]

### d. *Bruen* Step Two

This Court has similar reservations about *Bruen* step two:
whether the government has shown that permanently dis-
arming Mr. Bullock is supported by a historical tradition of
analogous laws.

Necessarily fewer district court cases reach this step; most are
satisfied with *Heller*'s assurances. That said, there are a few
themes among those that engage with this point.

---

[25] The *Rice* court also considered, at this step, whether felon disarmament
is justified by proposals discussed in three state ratifying conventions. *See*
2023 WL 2560836, at *7. This Judge thinks this analysis belongs at *Bruen*
step two, since it goes beyond an interpretation of the plain text of the
Second Amendment and into the history of arguably analogous provi-
sions. Accordingly, the ratifying conventions will be considered in more
detail below.

48

### i. The Ratifying Conventions

One theme focuses on the Massachusetts, Pennsylvania, and New Hampshire constitutional ratifying conventions. *E.g.*, *United States v. Hoeft*, No. 4:21-CR-40163-KES, 2023 WL 2586030, at *4 (D.S.D. Mar. 21, 2023).

At the Massachusetts convention, Samuel Adams proposed that gun rights be limited to "peaceable citizens." *Id.* (citation omitted). In Pennsylvania, Anti-Federalists proposed guaranteeing a right to bear arms "unless for crimes committed." *Id.* (citation omitted). And in New Hampshire, delegates recommended an amendment that guaranteed a right to bear arms to all except those "in actual rebellion." *United States v. Coombes*, No. 22-CR-189-GKF, 2022 WL 4367056, at *6 (N.D. Okla. Sept. 21, 2022) (citation omitted). These proposals, taken together, supposedly "demonstrate a continued understanding of the Second Amendment as restricted to law abiding citizens." *Hoeft*, 2023 WL 2586030, at *4.

This theory runs into a few problems.

First, and most obviously, none of these proposals became law. *See United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023). *Heller* reminds us that "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process," 554 U.S. at 590, and this is a good example of why that is true.

Maybe the Framers deleted the mention of law-abiding citizens from the Second Amendment because they wanted all persons to retain their "natural right of resistance and self-

preservation."[26] *Id.* at 594 (quoting Blackstone). Or maybe the Framers deleted law-abiding citizens from the Second Amendment because it was so widely understood that only the virtuous could keep arms that they need not waste precious words to codify popular understanding. No wonder thoughtful judges and scholars continue to disagree about what the omissions mean. *Compare United States v. Hicks*, No. W:21-CR-60-ADA, 2023 WL 164170, at *5 (W.D. Tex. Jan. 9, 2023) ("But those proposed amendments were just that: proposed.") and Larson, 60 Hastings L.J. at 1375 ("The best one can say is that at least some people in Pennsylvania felt criminals could be disarmed," but this "text is not reflected in the Second Amendment as proposed and ratified.") *with Coombes*, 2022 WL 4367056, at *7 ("no objection was made because the [felon] exclusions were understood."). Originalism doesn't tell us which of these interpretations is correct.[27]

---

[26] There's an obvious policy justification for this. If the government automatically and permanently disarms persons with felony convictions, won't future criminals know that the easiest, most helpless people to target for robbery, rape, and murder are the homes and families of those persons, who no longer can defend themselves? After all, "[f]elons who have served their sentences are no less susceptible to home invasions and assaults than are law-abiding people (perhaps even more susceptible)." Mark Tushnet, Heller *and the Perils of Compromise*, 13 Lewis & Clark L. Rev. 419, 424 (2009).

[27] The dilemma is a familiar one. *See Williams v. Florida*, 399 U.S. 78, 96-97 (1970) (holding that "provisions that would have explicitly tied the 'jury' concept to the 'accustomed requisites' of the time were eliminated. Such action is concededly open to the explanation that the 'accustomed requisites' were thought to be already included in the concept of a 'jury.' **But that explanation is no more plausible than the contrary one: that the deletion had some substantive effect**. Indeed, given the clear expectation that a substantive change would be effected by the inclusion or deletion

The second problem adds to the conundrum. *Bruen* expressly instructs judges to "doubt that *three* colonial regulations could suffice to show a tradition" of gun regulation. 142 S. Ct. at 2142; *see also id.* at 2153 ("we will not give disproportionate weight to a single state statute and a pair of state-court decisions."). Yet the ratifying conventions theory is based on three proposals.

The final difficulty for the ratifying conventions theory is the one Justice Barrett identified. Even if these three proposals are transmuted into actual law, and through some alchemy have their application broadened beyond three states to the entire nation, they do not justify the claimed restriction. "The concern common to all three" ratifying conventions, Justice Barrett concluded, "is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). She thought dangerousness was the proper lens, not status.

As a result, this Court is not persuaded that the ratifying conventions provide the historical support required to uphold § 922(g)(1).

### ii. The Death Penalty

Other courts find historical support for felon disarmament in "laws which authorized capital punishment and estate forfeiture for persons convicted of felonies." *Rice*, 2023 WL 2560836, at *8. They note that the "First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death including forging or counterfeiting a

---

of an explicit 'vicinage' requirement, **the latter explanation is, if anything, the more plausible.**") (emphasis added).

public security." *Id.* at 9 (citation omitted). Under this logic, "given the exceptionally heavy burden [death and estate for-feiture] place upon an individual, which inherently deprives the individual of their Second Amendment rights, disarma-ment under § 922(g)(1) is a comparatively lenient punishment and therefore is constitutionally permissible." *Id.*

It is true, as a matter of logic, that if the state has the power to end certain persons' lives, it necessarily has the lesser power to disarm those persons. Nevertheless, that does not prove what its proponents think it proves.

For one, we don't know the direction of the causal chain. Does this history mean that persons with felony convictions can be disarmed because some were executed? Or does it mean that disarmament applies only to persons convicted of a death-el-igible offense? Originalism doesn't say. But answering that question might immediately restore the Second Amendment rights of millions of Americans who, like Mr. Bullock, were convicted of death-ineligible felonies and served their sen-tences in full to return to the free world.

The en banc Third Circuit had a different take, based on the different nature of the punishments. "That Founding-era gov-ernments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at is-sue—lifetime disarmament—is rooted in our Nation's history and tradition," it held. *Range*, 69 F.4th at 105.

> The greater does not necessarily include the lesser: founding-era governments' execution of some individuals convicted of certain offenses does not mean the State, then or now, could con-stitutionally strip a felon of his right to possess

arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. Krause Dissent at 28-29. That aptly describes Range's situation. So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing for execution and forfeiture. *See Bruen*, 142 S. Ct. at 2132.

*Id.*

This case asks the same question. If America's historical tradition permitted a felon to repurchase firearms after completing their sentence, why can't Mr. Bullock today?

### iii. The Law Reviews

Again, most of the district court cases that make up the post-*Bruen* consensus do not engage with Second Amendment scholarship, finding *Heller*'s assurances more than sufficient to decide their motions to dismiss. Of those that do, however, several law journals articles recur. The top five most-commonly cited Second Amendment law review articles this Court catalogued were, in no particular order,

- Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020);
- C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009);
- Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 203 (1983);

53

- Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461 (1995); and
- Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986).

Set aside for a moment the credibility concerns with these pieces: the fact that none of these authors is a trained historian, that some of these authors are gun-rights advocates by profession, and that few law journals are peer-reviewed. Any fact-finder would take into account these problems were these articles and experts subject to the crucible of litigation. For the time being, though, consider the articles strictly on their merits.

The district courts citing these articles derived considerable utility from them. One court, for example, used the Greenlee, Marshall, and (first) Kates articles to deny the defendant's motion to dismiss, finding in them historical support for disarming dangerous individuals. *See United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *4 & n.3 (N.D. Ill. Mar. 28, 2023).

The problem is that these articles can be cherry-picked in the exact opposite direction—to support *granting* a defendant's motion to dismiss.

For example, Marshall concludes that "a lifetime ban on any felon possessing any firearm is not 'longstanding' in America." 32 Harv. J.L. & Pub. Pol'y at 697. And Greenlee finds "no historical justification for completely and forever depriving peaceable citizens—even nonviolent felons—of the right to keep and bear arms. Nor is there a historical justification for disarming unvirtuous citizens." 20 Wyo. L. Rev. at 286.

If applied here, therefore, Marshall's article supports Mr. Bullock's right to keep a long gun in his home for self-defense, 32 Harv. J.L. & Pub. Pol'y at 732, and approves of re-armament for someone in Mr. Bullock's situation. As Marshall writes, "it is difficult to see the justification for disarming a 60 year old who was convicted of a crime of violence at age 20, and was not punished capitally or with life in prison (classes that present no issue for an arms disability), but instead was released at age 40, and has stayed clean for 20 years." *Id.* at 735; *accord* Larson, 60 Hastings L.J. at 1381. If applied here, meanwhile, Greenlee's article would require additional proceedings to determine if Mr. Bullock was convicted of a violent or dangerous felony—the classification issue that will be addressed in detail below. 20 Wyo. L. Rev. at 285.

That leaves the Kates and Reynolds articles. They are even less persuasive.

As Greenlee acknowledges, Kates' *Michigan Law Review* article is "important" for setting forth the theory that the Second Amendment was historically limited to virtuous citizens. *Id.* at 275. But Greenlee discredits that article, and Kates' 1986 follow-up reaching the same conclusion, because they "provide[] no meaningful support for the theory" and lack "any examples of laws disarming 'unvirtuous' citizens." *Id.* at 275-76.[28] Greenlee gives no weight to Reynolds' 1995 article for the same reason: it "included no examples of laws disarming 'unvirtuous' citizens." *Id.* at 277. In short, neither the Kates nor

---

[28] *Accord* Larson, 60 Hastings L.J. at 1374 ("Yet the actual sources Kates relied upon (and which subsequent writers have echoed) are surprisingly thin. Indeed, so far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms.").

the Reynolds piece demonstrates the tradition of disarmament they are trotted out to prove.[29]

One might assume from this discussion that Greenlee got it right. This Judge is not so sure.

Greenlee, like Justice Barrett, makes several compelling points when he grounds in history the disarmament of dangerous persons, but the article is hardly bulletproof. When restricted only to Founding-era sources, half of Greenlee's argument rests on the three ratifying conventions already discredited above. 20 Wyo. L. Rev. at 265-67 and 275 (asserting that "American tradition reflects the right [Samuel] Adams envisioned."). And the other half of the Founding-era sources Greenlee relies upon show that persons could have their firearms right restored "once they no longer posed a violent threat." *Id.* at 269. If that is true, Mr. Bullock may have regained his Second Amendment right years ago.

### 3. Concluding Thoughts on History and Tradition

In *A Matter of Interpretation*, Justice Scalia argued that "legislative history" had been manipulated and abused by outcome-oriented judges. *A Matter of Interpretation* at 29-37. "Since there are no rules as to how much weight an element of legislative history is entitled to," he wrote, "it can usually be either relied upon or dismissed with equal plausibility." *Id.* at 35-36. This allowed the "willful judge" to discard evidence simply by calling it "ambiguous" or "inconclusive." *Id.* at 36.

---

[29] Kates also asserts that felon disarmament is historically justified because the common law "punished felons with automatic forfeiture of all goods, usually accompanied by death." 82 Mich. L. Rev. at 266. The sentence lacks any citation or analysis, and this Court has already discussed why this justification fails to support § 922(g)(1).

"On balance," he concluded, legislative history:

> has facilitated rather than deterred decisions that are based upon the courts' policy preferences, rather than neutral principles of law. . . . In any major piece of legislation, the legislative history is extensive, and there is something for everybody. As Judge Harold Leventhal used to say, the trick is to look over the heads of the crowd and pick out your friends. The variety and specificity of result that legislative history can achieve is unparalleled.

*Id.* at 35-36.

Three decades later, legislative history is out of favor, in part due to Justice Scalia's advocacy. But all of his critiques apply with equal force to this new Second Amendment regime—the discernment of "historical tradition."

The new standard has no accepted rules for what counts as evidence. As one historian said about *Bruen*, "the rule of evidence appears to be: if I agree with it, it's evidence—if I don't, it's not." Jill Lepore, *The Supreme Court's Selective Memory*, The New Yorker (June 24, 2022). Like Justice Scalia's nemeses, the justices who decided *Bruen* wrote off the history they didn't like by declaring it "ambiguous at best." 142 S. Ct. at 2139. And the new regime remains susceptible to accusations of political bias, as Judge Wilkinson (among others) has lamented. *See* 95 Va. L. Rev. at 267. Now, instead of plucking from the record a favorable statement of a friendly legislator, the Justices need only select a favorable historical analogue from a friend "in the legal academy." Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes:* Bruen*'s Originalist*

*Distortions*, ScotusBlog (June 27, 2022). As demonstrated above, though, the most-frequently-cited law journals in this area either fail to support or wholly contradict the result they are wielded to justify.

When he confronted these problems in the era of legislative history, Justice Scalia called for "an end" to this "brief and failed experiment, if not for reasons of principle than for reasons of practicality." *A Matter of Interpretation* at 36. "Judges lawyers, and clients will be saved an enormous amount of time and expense," he wrote. *Id.* "What a waste. We did not use to do it, and we should do it no more." *Id.* at 37.

For the same reasons, maybe it also is time to put an end to elevating "historical tradition" above all other modes of legal analysis.

### D. The Problem of Individual Adjudication

Modern felon-in-possession laws are fairly straightforward. Felony status is usually a simple binary, and it's easy to disarm the entire category of persons with felony convictions. Post-*Bruen*, however, the landscape may be much more complicated, requiring individual adjudication. Here are a few reasons why.

If the Supreme Court eventually determines at a high level of generality that "felon disarmament" is supported by history and tradition, we lower court judges need it to press on and determine the "original meaning" of a felony conviction. *Bruen*, 142 S. Ct. at 2137. Specifically, we need to know (1) whether all modern felonies result in disarmament, or just those that existed at the founding, and (2) whether all felonies result in disarmament, or just violent felonies. No matter how

those questions turn out, we then need to know whether disarmament is a temporary or permanent consequence.

Attempting to understand the contours of those questions, this Court researched the original public meaning of the felony. That history is long and complicated, but this Court will do its best to explain the relevant features.

"The traditional common law felonies were nine: murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny. Many more were added by statute." Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 464 (2009) (citation omitted). When Blackstone—whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (quotation marks and citation omitted)—wrote his Commentaries in 1765, "Parliament had designated at least 160 crimes as statutory felonies," Alice Ristroph, *Farewell to the Felonry*, 53 Harv. C.R.-C.L. L. Rev. 563, 572 (2018) (citation omitted). At that time, the definition of "felony" could be distilled into "crimes punishable by forfeiture and death." *Id.*

Although the Founders used the word in the Constitution, "the parameters of the felony category were unclear at the time the Constitution was drafted and remained so for several decades." *Id.* at 574. "A patch-work system of poorly organized and hard to locate statutes had created discontent with the legal system in post-Revolutionary America. This discontent was strengthened by uncertainty as to which portions of the common law tradition had made the transition from pre- to post-Independence." Tress, 57 Clev. St. L. Rev. at 471. There was no "regular course of practice" that would ordinarily

59

"liquidate & settle the meaning of disputed or indeterminate terms & phrases." *Bruen*, 142 S. Ct. at 2136 (cleaned up).

Reformers soon modernized the system. *See* Tress, 57 Clev. St. L. Rev. at 469-70. By 1823, there had been so many changes that Massachusetts lawyer and legislator Nathan Dane wrote that there were "many felonies, not one punished with forfeiture of estate, and but a very few with death." Christina Mulligan et al., *Founding-Era Translations of the U.S. Constitution*, 31 Const. Comment. 1, 45-46 (2016) (citation omitted).

To determine original public understanding, the Supreme Court has instructed us to be precise about the historical period we examine. On one hand, "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Bruen*, 142 S. Ct. at 2136. On the other hand, "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* No, the Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137 (collecting cases).

The problem is that "felony" was not well understood in 1791. One might think that, at a minimum, we could agree that the nine felonies enumerated at common law would qualify for disarmament. Not so fast.

Madison complained that the common-law definition of felony was "vague." Eugene Kontorovich, *Discretion, Delegation, and Defining in the Constitution's Law of Nations Clause*, 106 Nw. U. L. Rev. 1675, 1699 & n.113 (2012) (citation omitted). This Court does not know the context in which he said that, but

60

Justice Barrett has elaborated for us. In Madison's view, "'felony' was 'a term of loose signification even in the common law of England,' but more so in the States where '[t]he meaning of the term . . . [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws.'" *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (quoting The Federalist No. 42); *see also Voisine*, 579 U.S. at 698 ("The common law traditionally used a variety of overlapping and, frankly, confusing phrases to describe culpable mental states—among them, specific intent, general intent, presumed intent, willfulness, and malice.").

And what about the statutory felonies? Are we expected to adjudicate disarmament on a case-by-case basis by, for example, comparing the present charge a defendant is facing to its Founding-era analogue? Maybe we could apply a "historical categorical approach" to "compare the elements of the [modern] statute forming the basis of the defendant's conviction with the elements of the [historical] 'generic' crime—*i.e.*, the offense as commonly understood." *Descamps v. United States*, 570 U.S. 254, 257 (2013). And perhaps that also suggests a modified historical categorical approach, which "permits sentencing courts to consult a limited class of [modern] documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction," then "compare the elements of the [modern] crime of conviction (including the alternative element used in the case) with the elements of the [historical] generic crime." *Id.*

I say this tongue in cheek. We already use the categorical and modified categorical approaches to determine whether a defendant's past conviction is "for a violent felony" for purposes

61

of the Armed Career Criminal Act. *Id.* And the methodologies are not well-liked.

Professor Barkow, a former member of the U.S. Sentencing Commission, has described how "these state statutory questions end up clogging the federal court dockets, as judges struggle to determine whether various statutes from the fifty states meet the ACCA's definition of 'violent felony.'" Rachel E. Barkow, *Categorical Mistakes: The Flawed Framework of the Armed Career Criminal Act and Mandatory Minimum Sentencing*, 133 Harv. L. Rev. 200, 206 (2019). Justice Thomas calls the categorical approach "difficult to apply" and an "absurdity." *Quarles v. United States*, 139 S. Ct. 1872, 1880-81 (2019) (Thomas, J., concurring). Justice Alito says we have created a "mess" that "calls for sentencing judges to delve into pointless abstract questions." *Mathis v. United States*, 579 U.S. 500, 538, 541 (2016) (Alito, J., dissenting). Judge Bybee reports that "over the past decade, perhaps no other area of the law has demanded more of our resources." *United States v. Aguila-Montes de Oca*, 655 F.3d 915, 917 (9th Cir. 2011) (en banc). Given the critiques, perhaps we should not expand the methodology to the disarmament context.[30]

---

[30] The categorical approach is not universally condemned. *See United States v. Morris*, 61 F.4th 311, 321 (2d Cir. 2023) (Lohier, J., concurring) (finding "some wisdom" in it); *United States v. Faust*, 853 F.3d 39, 65-66 (1st Cir. 2017) (Barron, J., concurring) (concluding that the categorical approach "respects . . . the notice-protecting principle of lenity" and, "for all of its faults, reflects respect both for due process and federalism"); Amit Jain and Phillip Dane Warren, *An Ode to the Categorical Approach*, 67 UCLA L. Rev. Discourse 132, 135-36 (2019) ("The categorical approach . . . is far from the nonsensical nightmare its naysayers portray it to be. . . . Sure, the approach can be difficult to apply at times; federalism, after all, is messy.

Justice Barrett found dangerousness, rather than felony status, the dispositive lens of historical disarmament. Her dissent is fairly compelling. The Fifth Circuit's recent decision in *United States v. Rahimi*, however, rejected analogies to historical laws disarming "dangerous" people, because the "why" of those laws was different than the "why" of modern laws. 61 F.4th at 457. It concluded that Founding-era Americans disarmed people to preserve "political and social order," rather than protect potential victims from the threat of crime. *Id.*

Finally, if dangerousness is indeed the lens through which disarmament is adjudicated, we will need to know the proper standard to apply. Judge Schreier observes that in her Circuit, the definition of dangerousness is different from the definition of crime of violence; dangerousness requires only "the potential for harm to another person." *Hoeft*, 2023 WL 2586030, at *5 (citation omitted). She found that manslaughter easily met that definition, sufficient to support a restriction of the defendant's Second Amendment rights. *Id.* If the definition of violence is applied, in contrast, some forms of second-degree murder, manslaughter, and assault may be excluded. That is so because "in many States, some forms of second-degree murder and manslaughter do not require intent or knowledge," and "several States criminalize felony assault in a single, indivisible provision that can be satisfied by intent, knowledge, or recklessness." *Borden v. United States*, 141 S. Ct. 1817, 1856 (2021) (Kavanaugh, J., dissenting) (citations omitted).

Even so, the categorical approach is far and away the fairest, most consistent, and most administrable option among alternatives.").

63

This Court does not know the answers to these questions, but presents them here in hopes that future judges and justices can answer them with enough detail to enable trial courts to perform their duties.

## IV.  Mr. Bullock's Case

The remaining question is how this law applies to Mr. Bullock.

For the reasons stated above, this Court believes that *Heller*'s assurances about felon-in-possession laws are not controlling. The new standard articulated in *Bruen* applies.

At *Bruen* step one, the plain text of the Second Amendment covers Mr. Bullock's conduct—possession of ordinary firearms in the home—and therefore presumptively protects him. The burden then shifts to the government. It cannot "simply posit" that § 922(g)(1) "promotes an important interest." *Bruen*, 142 S. Ct. at 2126. Instead, "the government must demonstrate that [§ 922(g)(1)] is consistent with this Nation's historical tradition of firearm regulation." *Id.*

### A.  The Government's Prior Positions

The government attorney prosecuting Mr. Bullock's case, like all of us dealing with *Bruen*'s fallout, was placed in an unenviable position. That is because in cases litigated not that long ago, the U.S. Department of Justice formally advanced the position that early American history did *not* support felon disarmament.

In 2011, for example, the Department told Judges on the U.S. Court of Appeals for the Fourth Circuit that "[a]s for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms." Brief of

64

Appellee, United States v. Staten, No. 10-5318, 2011 WL 1542053, at *25 (4th Cir. Apr. 25, 2011). Similarly, in a case pending before the U.S. Court of Appeals for the First Circuit, the government told the court that "18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." Brief of Appellee, United States v. Pettengill, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011).

Given *Bruen*'s demanding standard, these admissions suggested that the government had its work cut out for it.

### B. The Government's Response Brief

In any event, the three-and-a-half-page response brief the government filed in this case, dated September 8, 2022, fails to meet its burden.

The government opens by asserting that earlier in 2022, the Fifth Circuit rejected a challenge to another provision of § 922(g). Docket No. 63 at 1. Not so. The case it cites, *United States v. McGinnis*, was decided in 2020, not 2022. 956 F.3d 747 (5th Cir. 2020). That means it was decided without the benefit of *Bruen*. And recall that *Bruen* expressly abrogated Fifth Circuit law. *See* 142 S. Ct. at 2127 n.4.

The government then quotes *Heller*'s assurance that felon-in-possession laws are presumptively lawful. Docket No. 63 at 2. As already explained, the Court cannot honor the advisory opinion that assurance represents.

Next, the government attempts to limit *Bruen* to gun permit disputes. *Id*. Mr. Bullock cannot benefit from the case, it claims, because he "is charged pursuant to a statute that does not involve the exercise of discretion in determining whether

65

to grant firearms permits." *Id.* That fails to recognize how *Bruen* articulated a new legal standard applicable to all Second Amendment challenges.

The government then tries to apply selected language from *Bruen*. It urges that the decision protects only "'the right of law-abiding, responsible citizens to use arms' for self-defense." 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

Although the en banc Third Circuit found these words to constitute "dicta," *Range*, 69 F.4th at 101, a point on which this Court agrees, they form the core of the government's argument here. So what follows will explain in more detail why this language cannot bear the weight it is given.

First, if the Court is to honor this line, it must necessarily refuse to honor the very next paragraph of *Heller*, in which the Supreme Court promised the American people that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635. This Court does not know how to make that choice. The bevy of post-*Bruen* cases suggest that the time to expound upon the historical justifications for § 922(g)(1) is now.

Second, as *Range* explained, the phrase "law-abiding, responsible citizens" is "hopelessly vague." 69 F.4th at 102. It cannot "mean that every American who gets a traffic ticket" loses her Second Amendment rights.[31] *Id*. But limiting it to quote-

---

[31] Nor can it mean that every postal carrier who steals a $15 gift card from the mail should lose her Second Amendment right. *See, e.g.*, *United States v. Marshall*, No. 3:18-CR-248 (S.D. Miss. filed Dec. 11, 2018) (former USPS carrier pleaded guilty to violating 18 U.S.C. § 1709 by stealing a $15 Lowe's gift card from the mail); *United States v. Rosell*, No. 3:18-CR-255 (S.D. Miss.

unquote "real crimes" like felonies also misses the mark, because some modern felonies "seem minor" and "some misdemeanors seem serious." *Id.* The modifier "responsible," meanwhile, is impossible to apply. "In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Id.*

Finally, even if the Second Amendment protects only "law-abiding, responsible citizens," that does not resolve whether § 922(g)(1) is constitutional as applied to Mr. Bullock. He completed his sentence approximately 15 years ago. An examination of history and tradition cannot be avoided in this case—in other words, *we must* grapple with the historical record around felon disarmament—because we need to know whether Mr. Bullock's Second Amendment rights were restored upon completion of his carceral sentence. But the government has avoided the issue of rights restoration.

The government's brief doesn't say much more. It quotes the concurrences of Justices Alito and Kavanaugh for the proposition that felon-in-possession laws were left undisturbed by *Bruen*, Docket No. 63 at 3, but this Order has already addressed those points. The government cites a colleague's decision denying a similar motion to dismiss, but that decision relies upon *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) to conclude that "the government could disarm 'unvirtuous citizens.'" *United States v. Daniels*, 610 F. Supp. 3d 892, 896

---

filed Dec. 12, 2018) (former USPS employee pleaded guilty to violating 18 U.S.C. § 1709 by stealing a Lowe's gift card and $10 from the mail); *United States v. Sumner*, No. 3:20-CR-152 (S.D. Miss. filed Nov. 17, 2020) (former USPS employee pleaded guilty to violating 18 U.S.C. § 1709 by stealing and using 15 $10 coupons from the mail).

67

(S.D. Miss. 2022). As shown above, that theory lacks historical support.[32] And lastly, the government summarily asserts that § 922(g)(1) "is part of the historical tradition of regulating firearms possession 'to prevent guns from falling into the wrong hands.'" Docket No. 63 at 3. The case it quotes for that proposition, however, predates *Bruen*, concerns a different criminal law, and says nothing about historical tradition. *See Abramski v. United States*, 573 U.S. 169, 172 (2014).

Missing from this brief, in sum, is any example of how American history supports § 922(g)(1), much less the number of examples *Bruen* requires to constitute a well-established tradition. The government has, therefore, not met its burden.

To this, the government will likely argue that the Court should consider its three supplemental briefs. The Court turns to those now.

### C.  The Government's Supplemental Briefs

Recall that after the briefing closed on the Motion to Dismiss, the Court asked the parties to provide their "position[s] on the appointment of a consulting expert." Docket No. 65 at 6. The government timely responded. Docket No. 71. It first argued that, given precedent, no historian was required because "the prohibition against felons possessing firearms is so thoroughly established as to not require detailed exploration of the historical record for the purpose of this case." *Id.* at 1. It then presented a new line of attack, contending that Mr. Bullock qualifies for disarmament because his felonies were violent and he is dangerous. *Id.* at 6-7.

---

[32] *Yancey* is based on the same Reynolds and Kates articles that don't provide any examples to support their theory. *See* 621 F.3d at 684-85.

The first argument was in line with the government's response brief and presents no procedural problem. The new line of attack, however, was untimely and will not be considered.

*Bruen* was clear. "[I]n our adversarial system of adjudication, we follow the principle of party presentation." 142 S. Ct. at 2130 n.6 (citation omitted). "Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quotation marks and citation omitted). It is for that reason that we hold counsel, and their clients, to the positions they advance at the time they should be advanced. *See Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962).

One of the rules of party presentation is that courts may decline to consider arguments "outside the scope of the supplemental briefing." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 56 (D.C. Cir. 2014). The rule is wielded across the Courts of Appeals and the district courts of this Circuit. *See United States v. McCann*, 517 F.3d 1, 2 n.1 (1st Cir. 2005); *Sharp v. Johnson*, 669 F.3d 144, 153 n.3 (3d Cir. 2012); *Doe v. Heil*, 533 F. App'x 831, 836 n.4 (10th Cir. 2013); *United States v. Jackson*, 373 F. App'x 7, 10 n.4 (11th Cir. 2010); *see also Saketkoo v. Tulane Univ. Sch. of Med.*, 510 F. Supp. 3d 376, 398 (E.D. La. 2020); *Whitney Nat. Bank v. Boylston*, No. CIV.A. 09-59, 2009 WL 2423957, at *4 (W.D. La. Aug. 6, 2009); *MacroPoint, LLC v. Ruiz Food Prod., Inc.*, No. 6:16-CV-1133-RWS-KNM, 2017 WL 3722053, at *6 (E.D. Tex. Aug. 29, 2017). "To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a *pro se*

69

litigant's rights"—not the government's. *Greenlaw*, 554 U.S. at 243-44 (citation omitted).

Here, the Court exercises that discretion and declines to consider the United States' untimely argument that Mr. Bullock may be disarmed because of violent felonies or dangerousness. It constitutes an unauthorized second bite at the apple.

Even if the Court considered this argument, it would reject it on the merits.

In this part of its supplemental brief, the government blames Mr. Bullock for "find[ing] no proponent for a Second Amendment right to bear arms in the existing case law in this Circuit or elsewhere and there is no basis to expect that resort to the historical record will be of any avail under the circumstances of this case." Docket No. 71 at 7. But after *Bruen*, the burden to prove historical analogues rests on the government, not the defendant. "The United States was thus well aware that *Bruen* not only placed the burden squarely on it to develop the historical record, but also put it on notice that its failure to do so might be decisive." *United States v. Stambaugh*, No. CR-22-218-PRW-2, 2023 WL 172037, at *5 (W.D. Okla. Jan. 12, 2023).

The government's violent-and-dangerous argument is also out of sequence, as the government still had not (and has not today) proven the predicate question: that there is a historical tradition of disarming either the violent or the dangerous. The government had to prove the underlying principle of disarmament before it could apply it to Mr. Bullock.

Mr. Bullock has a criminal history, yes. Armed with that knowledge, though, the government put forth no effort to ground in history the present charges it brought again him. That is what *Bruen* requires. As the *Stambaugh* court

70

concluded in finding unconstitutional a different portion of §
922 after *Bruen*, "[a] historical analogue to support constitu-
tional applications of § 922(n) might well exist, but the United
States hasn't pointed to it. . . . [T]hat failure is fatal." *Id.* at *6.

\* \* \*

Again, Mr. Bullock presents an as-applied challenge to
§ 922(g)(1). He contends that the charge against him, and him
only, should be dismissed because "the prosecution has failed
to establish a 'historical tradition' supporting lifetime crimi-
nalization of [his] possession of a firearm." Docket No. 64 at
9. The Court agrees. In plain English, that means that the
charge against Mr. Bullock will be dismissed today, and the
federal government may continue to prosecute other persons
for violating § 922(g)(1).[33]

## V.  Conclusion

This Court has contemplated and researched the latest Second
Amendment standard for quite some time. It has two final
thoughts about this new Constitutional regime. They concern
how the Court defines Constitutional rights and originalism's
place in American law.

### A.   The Persistence of Second-Class Constitutional Rights

Since 2008, the Supreme Court has broadly construed the Sec-
ond Amendment. "Arms" is defined at a high level of gener-
ality. It is not limited to the weapons of 1791, like muskets and
flintlock pistols, or those arms that a Militia uses in collective
defense. Instead, "arms" includes "*modern* instruments that

---

[33] Of course, the government may seek appellate review of this ruling,
giving the Fifth Circuit another opportunity to grapple with the post-
*Bruen* landscape.

facilitate armed *self*-defense." *Bruen*, 142 S. Ct. at 2132 (emphasis added).

Gun-rights advocates have no doubt celebrated this definition. The Second Amendment is second-class no longer. It is the brightest star in the Constitutional constellation.

But this expansive definition is puzzling. Many Americans think about originalism in a different way. *If Founding-era Americans knew what semi-automatic weapons could do,* some say, *surely they would have limited their availability. See, e.g.,* Christopher J. Peters, *What Are Constitutional Rights for? The Case of the Second Amendment,* 68 Okla. L. Rev. 433, 459 (2016).

Nevertheless, in its recent Second Amendment cases, the Court chose broad definitions over narrow ones. It construed the text so expansively that we are still working to understand its scope.

In breathing new life into the Second Amendment, though, the Court has unintentionally revealed how it has suffocated other fundamental Constitutional rights. Americans are waiting for *Heller* and *Bruen*'s reasoning to reach the rest of the Constitution.

Consider the right to a "speedy" trial. U.S. Const. amend. VI. The Supreme Court's leading speedy trial case blessed a five-year delay between the defendant's arrest and his trial. *See Barker v. Wingo,* 407 U.S. 514, 533 (1972). But that doesn't comport with the historical understanding of a "speedy" trial—which was apparently measured in months, not years. *See Klopfer v. North Carolina,* 386 U.S. 213, 223-24 (1967).[34] Unless

---

[34] No wonder "the Mississippi Supreme Court has not reversed a criminal conviction for a speedy trial violation since 1992." *Patterson v. Hinds Cnty., Mississippi,* No. 3:13-CV-432, 2016 WL 7177762, at *4 (S.D. Miss. June 10,

the Court takes the *Bruen* approach to the Sixth Amendment, innocent Americans will continue to suffer in jail for years.

Consider the ancient right to a "Writ of Habeas Corpus." U.S. Const. art. I, § 9, cl. 2. The burden of securing habeas relief falls upon the individual rather than the government, and Supreme Court "holdings that speak only at a high level of generality" *cannot* supply a ground for relief. *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022). In habeas, rather, the law requires "a more granular approach." *Russell v. Denmark*, 68 F.4th 252, 272 (5th Cir. 2023). Until the Court applies expansive, *Bruen*-like definitions in this area of the law, the Great Writ will continue to have second-class status.

You might explain away the Court's habeas caselaw as reflecting proper deference to the political branches,[35] rather than a result of the Justices' choices. Until you compare the Court's treatment of habeas to its treatment of voting rights.

Despite not being enumerated in the Constitution, voting is a "fundamental right." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). That is because voting is "preservative of all rights." *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 667 (1966). Even before the twentieth century, the Supreme Court professed as much. *See Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

---

2016) (citations omitted). It faces no consequence for erasing this Constitutional right.

[35] Congress and the President severely limited habeas relief in 1996, when they enacted into law the Antiterrorism and Effective Death Penalty Act. The Supreme Court had no problem with those restrictions. *See Felker v. Turpin*, 518 U.S. 651 (1996).

Congress and the President took action to protect this right, pursuant to their power under the Reconstruction Amendments, when they enacted the Voting Rights Act of 1965. The political branches reauthorized that law for decades. The latest reauthorization unanimously passed the Senate in 2006. President George W. Bush signed it into law.

The Supreme Court, however, found the reauthorization to be unconstitutional. Congress's factual findings were not sufficiently "updated" to pass muster. *Shelby Cnty., Alabama v. Holder*, 570 U.S. 529, 557 (2013). If an individual tries to enforce their fundamental right to vote, "they bear a heavy burden" to prove the violation, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 200 (2008), and they must define the scope of the right "at a painfully high degree of specificity," Bridges, 136 Harv. L. Rev. at 27.[36] The blessings of *Bruen* have not passed down to voting.

Perhaps the most glaring inconsistency is found when individuals seek money damages for constitutional violations. In marked contrast to its Second Amendment caselaw, the Court places the burden to prove the constitutional violation on the harmed individual. And again unlike the Second Amendment standard, when it comes to these disfavored rights, the high Court expressly *forbids* us from defining the right "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks and citation omitted). Lower courts must instead "frame the constitutional question with specificity and

---

[36] For example, because voter identification laws were not specifically "used during the pre-Civil Rights Era to injure people of color, . . . the Roberts Court sees no racial injury in present-day voter identification laws that it is willing to remedy." Bridges, 136 Harv. L. Rev. at 27. "The discovery of a resemblance is a matter of interpretation, after all." *Id.* at 28.

74

granularity." *Morrow v. Meachum*, 917 F.3d 870, 874-75 (5th Cir. 2019). The notion that we could treat these rights as we treated the Second Amendment in *Heller, McDonald,* and *Bruen* is altogether absent.

Maybe the Supreme Court is correct that in this country, to "secure the Blessings of Liberty to ourselves and our Posterity," the government should have the burden of justifying itself when it deprives people of their constitutional rights. Perhaps the Court is also correct that constitutional rights should be defined expansively. The Court just isn't consistent about it.

We have one Constitution. All of it is law. It has been enforced today as best as this Judge can discern the *Bruen* Court's holding and reasoning. And, one hopes, a future Supreme Court will not rest until it honors the rest of the Constitution as zealously as it now interprets the Second Amendment.

### B.  Revisiting Originalism

*Bruen* shows us that originalism is now the Supreme Court's dominant mode of constitutional interpretation. This Court is not so sure it should be.

For one, the originalist case for originalism is lacking. This Court has yet to see evidence proving "that the original meaning of Article III of the Constitution included the understanding that courts should interpret the Constitution based on its original meanings." Erwin Chemerinsky, Worse than Nothing: The Dangerous Fallacy of Originalism 82 (2022) [hereinafter *Worse than Nothing*]. In other words, it is not clear that founding-era Americans collectively agreed that for time immemorial, their descendants would be bound by the founding generation's views on how the Constitution should be read.

75

This Court is also not sure that ceding this much power to the dead hand of the past is so wise. "The American people learned a great deal during the early years of their Republic— including that many of their most cherished beliefs and firmly held ideas were either wrong or unworkable." Larry D. Kramer, *The Supreme Court 2000 Term Foreword: We the Court*, 115 Harv. L. Rev. 4, 12 (2001).[37] The Framers themselves "knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003).

We have seen this evolution time and time again.

Many of our Nation's finest moments came when we rejected the original public meaning of a Constitutional provision. *Brown v. Board of Education* rejected the original interpretation of "equal protection," which had led to "separate but equal" schools. *Worse than Nothing* at 68-69. The original understanding of the Fourteenth Amendment limited women "to fulfil the noble and benign offices of wife and mother." *Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) (Bradley, J., concurring). It had to go. Earlier Americans might not have understood the notion of "due process" to include marriage equality. *See Obergefell v. Hodges*, 576 U.S. 644 (2015). But future generations did. "We changed." *Campaign for Southern Equality v. Bryant*, 64 F. Supp. 3d 906, 922 (S.D. Miss. 2014).

Hewing to outdated ideas no longer served "We the People." Hewing too closely to the past reduced our ability to make America "more perfect." As a result, "new constitutional

---

[37] Dean Kramer wondered "why any sensible person, even a lawyer, would privilege the speculative writings of the 1780s over the hard-earned experience of subsequent decades." 115 Harv. L. Rev. at 12.

principles . . . emerged to meet the challenges of a changing society." Thurgood Marshall, *Reflections on the Bicentennial of the United States Constitution*, 101 Harv. L. Rev. 1, 5 (1987). And in this way, "the true miracle was not the birth of the Constitution, but its life, a life nurtured through two turbulent centuries of our own making, and a life embodying much good fortune that was not." *Id.*

Let's be clear about what this means for originalism. The next generation will have its own conceptions of liberty. It will interpret the principles of the Constitution, enduring as they are, differently than this generation has interpreted them. Change is unstoppable. And to the extent *Bruen* and decisions like it try to stop that change, they will not last long. The only question is how long the People will let them remain.

The motion to dismiss is granted. The Clerk of Court shall close the case.

**SO ORDERED**, this the 28th day of June, 2023.

s/ Carlton W. Reeves
*United States District Judge*